A09A1693. CREWEY et al. v. AMERICAN MEDICAL RESPONSE OF GEORGIA, INC.

(692 SE2d 851)

BERNES, Judge.

David A. Crewey appeals from the trial court's order granting summary judgment to American Medical Response of Georgia, Inc. ("AMR"), an ambulance company, in his lawsuit alleging that AMR was negligent in its attempts to timely provide ambulance transport to Crewey following a heart attack. The trial court's order was based upon its conclusion that AMR was afforded immunity under OCGA § 31-11-8, which shields emergency care providers from civil damages under certain circumstances. Because we conclude that the acts alleged to have been negligently performed by AMR fall outside of the purview of OCGA § 31-11-8, we reverse.

On appeal from the grant of summary judgment, we view the record in the light most favorable to the nonmoving party, construing all evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party. See *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335 (671 SE2d 844) (2008). We review issues of

---

[3] *Wilson v. State*, 57 Ga. App. 839, 841 (197 SE 48) (1938).

[4] OCGA § 16-2-6.

[5] *Wilson,* supra.

law de novo. See *Dept. of Human Resources v. Nation*, 265 Ga. App. 434, 436 (594 SE2d 383) (2004).

So viewed, the evidence shows that on May 14, 2004, Crewey called 911 after experiencing chest pains and other symptoms consistent with a heart attack. Emergency medical personnel arrived on the scene and transported Crewey to Emory Dunwoody Medical Center ("Dunwoody"), where it was confirmed that Crewey was in fact suffering an acute myocardial infarction. The emergency cardiologist at Dunwoody performed some initial treatment on Crewey, but soon determined that Dunwoody did not have adequate resources to properly treat him. The cardiologist therefore ordered that Crewey be transported to the cardiac catheterization laboratory at Emory Heart and Vascular Center ("Emory"), where Crewey would be catheterized and undergo emergent angioplasty.

At 6:47 p.m., a nurse at Dunwoody contacted AMR to request transportation services pursuant to a contractual agreement under which the hospital agreed to make AMR its "first provider," or the first company that it called for ambulance services (the "Contract"). The nurse informed the AMR operator that Crewey was suffering from an "[a]cute MI" and was in need of "a stat ambulance," and further informed her that the ambulance had to be an "advanced unit," requiring that it have at least one paramedic and be equipped with advanced life support equipment.[1] After the nurse rebuked the

---

[1] The relevant components of the telephone exchange between AMR and the nurse were as follows:

*AMR*: Thank you for calling American Medical Response, . . . may I help you[?]
*Dunwoody*: Yea this is . . . Dunwoody. We have a patient that needs to go to Emory Heart Center, need an advanced unit.
*AMR*: Alright, what's the patient's last name?
*Dunwoody*: Crewey. . . .
*AMR*: And the first name?
*Dunwoody*: David.
*AMR*: And what room is he in?
*Dunwoody*: He's in room . . . 5 in the ER. He's an acute MI.
*AMR*: Ok & he's going where?
*Dunwoody*: Emory Heart Center.
*AMR*: Do you know what the address is?
*Dunwoody*: Its at the main Emory.
*AMR*: Ok & which Emory are you?
*Dunwoody*: Emory Dunwoody.
*AMR*: Oh ok, I got them backwards.
. . .
*AMR*: [H]ow old is the patient?
*Dunwoody*: 41
*AMR*: Diagnosis?
*Dunwoody*: Acute MI.
*AMR*: Will he need special equipment or medications on the transport?
*Dunwoody*: Probably.
*AMR:* Ok, what will he need?

AMR operator's attempts to obtain Crewey's insurance and other information by reemphasizing the need for a quick response, the AMR operator informed the nurse that AMR could not provide an advanced unit for at least one to one and one half hours.[2] In accordance with its company policy, the AMR operator agreed to "turn the call," or help locate another ambulance service to provide the transport, but first requested that the nurse locate and provide Crewey's insurance information. When a nurse supervisor contacted AMR shortly thereafter, however, the AMR operator indicated that AMR could not provide an ambulance for at least two hours, but agreed to furnish the nurse supervisor with telephone numbers of alternate ambulance services without first requiring Crewey's insurance information; both women then began making calls to find

---

*Dunwoody*: Well, we need an advanced unit. He's got a nitro drip. He's got a normal saline drip. He's gonna need a monitor, O2 & he may need cardiac drugs on the way.
*AMR*: Ok & let's see, will this be billed to his insurance?
*Dunwoody*: I have no idea! Uh let's see, I think he does have insurance. Right now I don't have his list of what his insurance is but either way it will be billed to his or to us.
*AMR*: Ok, I don't . . . ok so he's going for a higher level of care at Emory?
*Dunwoody*: Right.
*AMR*: Something he can't get at Dunwoody?
*Dunwoody*: It's a heart cath.
*AMR*: Is there any way that you could possibly find out what . . . ?
*Dunwoody*: (interrupting) We need a stat.ambulance now! We have a contract with ya'll that ya'll will transport our patients!
*AMR*: Ok.
*Dunwoody*: So we need an ambulance quickly!
*AMR*: Ok hold on one second.
*Dunwoody*: (mumbling in the background) Every freaking time . . .
*AMR*: Ma'am, the best I can do at the moment is offer to turn the call for you? The best eta we have at the moment is an hour and a half.
*Dunwoody*: No! Our contract with ya'll says you have to find us somebody within an hour.
*AMR*: That's what I just said, I can go ahead and turn the call for you.
*Dunwoody*: Ok.
*AMR*: I can go ahead & try to find another service to take the call for you.
*Dunwoody*: Ok.
*AMR*: Ok, but I need the insurance information on that ok. If you can call me back with that?
*Dunwoody*: Ok.
*AMR*: Ok, thanks.
END CALL

[2] As calls come into AMR, the AMR operator is tasked with assigning each call a priority level. According to the AMR operator, incoming calls can be characterized in one of four ways — emergent, immediate, nonemergency ("NET"), and scheduled. Emergent calls require the ambulance to respond with "lights and sirens." As for the remaining levels, the Contract provided that expected response time for immediate requests was 30-45 minutes, NET requests was 45 minutes to 1 hour, and scheduled (or prearranged) transports were to be on-time. There is evidence in the record that the transportation request for Crewey was originally given emergent priority but was then changed to immediate priority, and further that the AMR operator believed that calls given immediate priority required a response time within 60 minutes.

another transport provider.[3]

Eventually, Dunwoody successfully found an alternative ambulance service to transport Crewey to Emory; however, the ambulance did not arrive at Dunwoody until 7:55 p.m. Upon his arrival at Emory, Crewey immediately underwent catheterization and angioplasty, but by that time he had suffered a large amount of damage to his heart. In the weeks and months that followed, Crewey continued to suffer complications, and ultimately received a defibrillator implant.

Crewey filed the instant lawsuit, alleging that AMR acted negligently in its attempts to provide him timely transportation services and that, as a result of the delay caused by AMR's conduct, he suffered severe injury and damage to his cardiovascular system.

---

[3] The relevant components of the telephone exchange between AMR and the nurse supervisor, which began at 6:54 p.m., were as follows:

*AMR*: Thank you for calling American Medical Response . . . may I help you[?]

*Dunwoody*: Hi this is . . . the supervisor at Dunwoody Medical Center. I think you guys were just talking to our ER folks about a transfer to Emory. I understand you can't get a unit here for 2 hrs, is that correct?

*AMR*: Yes.

*Dunwoody*: Ok, can you help us get somebody else here because this guy is critical and I'm afraid he's not going to last 2 hrs.

*AMR*: Ok. I advised her earlier when I spoke to her that I would go ahead and turn the call over to another service. I would go ahead & make the calls and find somebody else to take it. I had told her that I did need to know what type of insurance that the gentleman had and asked her to call me back with that.

*Dunwoody*: Why is it that you don't have a unit, because we have a contract with your service. You don't have anybody that you can send over here?

*AMR*: It's non emergency. Hold on one moment I'll let you speak with [a supervisor] about that ok?

*Dunwoody*: Alright.

*AMR*: Thank you. (after a brief hold) Ma'am, ok I do apologize. . . . [The supervisor] is in the middle of taking a call at the moment and I'm trying to get the information settled here in your call. I don't know, I mean I can try to get you the best eta that I can by calling the other services & all I can tell you at the moment is that I know that we don't have anybody that's going to be able to make it there for a stat transport.

*Dunwoody*: Ok. It has to be a Critical Care Unit obviously. This guy is going to the Cath Lab. He's an acute MI. He's a 41 [year old] guy who's in pretty bad shape so I mean if you can do that, start calling around but I mean, or if you can give me some numbers I'll start calling. I just need to get someone here so we can get him over to the Heart Cath Lab at Emory.

*AMR*: Yes ma'am. Yeah that's no problem at all. I've got an entire list here and I can go ahead and turn this call over for you and it's no problem.

*Dunwoody*: Ok, and then well I won't worry about the insurance; I'll just worry about getting him over there. So, but he won't be able to be there until I get you all the insurance information, is that right?

*AMR*: No, no, I'll do it anyway.

*Dunwoody*: Ok.

*AMR*: Yeah, I'll do it without that. That's not a problem.

*Dunwoody*: Ok.

*AMR:* I just asked her if she could call me back with that.

. . .

In support of its complaint, Crewey submitted an expert affidavit from his treating physician who opined that "[i]t took 67 minutes for transport [of Crewey] to begin when it should have taken 30 minutes or less," thus resulting in a 37-minute delay of treatment. The doctor further averred that

> based upon [his] education and [his] professional experience, it is [his] medical opinion to a reasonable degree of medical certainty that the 37 minute delay in transport of David Crewey on May 14, 2004 was the proximate cause of a substantial amount of the heart damage that Mr. Crewey now suffers. Further, that had Mr. Crewey been timely transported that the heart [catheter] would have taken place a long time prior to when it was eventually done. Specifically, the negligence of [AMR] resulted in an injury to Mr. Crewey. It is [his] opinion to a reasonable degree of medical certainty that the injury could have been avoided absent such negligence. . . . It is further [his] understanding and medical opinion to a reasonable degree of medical certainty that the damage to David Crewey's heart was as a direct and proximate cause of the delay in transport from . . . Dunwoody to [Emory] by [AMR], and these injuries, complications and damages would have been avoided had only transportation been timely implemented and received. That it is further [his] opinion to a reasonable degree of medical certainty this specific delay in treatment puts David Crewey at a greater risk for cardiac arrest, or even sudden death.

AMR moved for summary judgment, arguing that it did not breach any duty, in contract or in tort, to Crewey. The trial court granted AMR's motion in part after concluding that AMR did not owe a contractual duty to Crewey; the trial court nonetheless denied AMR's motion in part after holding that a genuine issue of material fact remains as to whether AMR owed Crewey a duty under the Restatement 2d Torts § 324A (a), (c).[4] AMR then filed a second motion for summary judgment, contending that it was nonetheless

---

[4] Restatement 2d Torts § 324A (a), (c) provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or . . . (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

immune from civil liability as an emergency care provider pursuant to OCGA § 31-11-8. The trial court granted AMR's motion, and it is from this order that Crewey appeals.

The statutory immunity set forth in OCGA § 31-11-8 "was enacted as part of a comprehensive Act to provide the citizens of this state with efficient, safe and professional ambulance service." *Anderson v. Little & Davenport Funeral Home*, 242 Ga. 751, 754 (2) (251 SE2d 250) (1978). The statute provides, in relevant part:

> Any person, including agents and employees, who is licensed to furnish ambulance service and who in good faith renders emergency care to a person who is a victim of an accident or emergency shall not be liable for any civil damages to such victim as a result of any act or omission by such person in rendering such emergency care to such victim. . . .
>
> The immunity provided in this Code section shall apply only to those persons who perform the aforesaid emergency services for no remuneration.

OCGA § 31-11-8 (a), (c). "Emergency care" has been defined as "the performance of necessary personal services during an unforeseen circumstance that calls for immediate action." *Anderson*, 242 Ga. at 753 (1). And "[t]he statute is carefully drawn so as to grant immunity to providers of ambulance service only for their acts and omissions in rendering such emergency care." (Punctuation omitted.) Id. at 754 (2). See *Bricks v. Metro Ambulance Svc.*, 177 Ga. App. 62, 69 (2) (338 SE2d 438) (1985).

AMR did not render "emergency care" as contemplated by OCGA § 31-11-8 (a).[5] To the contrary, it was AMR's inability to provide Crewey with the necessary emergency care sought by Dunwoody that led to the series of events in question. See generally *Bricks*, 177 Ga. App. at 69 (2) (holding OCGA § 31-11-8 inapplicable because claim of liability against the ambulance company was not founded upon the rendition of medical care). The record shows that the services undertaken by AMR in this case were taken on behalf of Dunwoody and were done pursuant to AMR's written policy. This

---

[5] Crewey asserts that AMR is bound by judicial admissions made in a sworn affidavit from its general manager as well as its statement of undisputed material facts submitted with its first motion for summary judgment, both in which AMR insisted that it "did not provide emergency care . . . to Plaintiff David Crewey on May 14, 2004." Because the question of whether AMR rendered medical care as that term has been defined under OCGA § 31-11-8 (a) is a mixed question of law and fact, as opposed to a purely factual question, AMR's admissions are not determinative. See generally *Bollers v. Noir Enterprises*, 297 Ga. App. 435, 437 (1) (677 SE2d 338) (2009).

factual scenario simply falls outside of the purview of the protection offered by OCGA § 31-11-8. See generally id. Thus, without expressing any opinion as to the question of AMR's liability, we conclude that the trial court erred in granting it summary judgment on the basis of emergency care immunity.

*Judgment reversed. Smith, P. J., and Phipps, J., concur.*

DECIDED MARCH 30, 2010.

*Irwin M. Ellerin*, for appellants.
*Hawkins & Parnell, Patricia M. Peters*, for appellee.