**THIRD DIVISION
MILLER, P. J.,
RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**November 28, 2012**

# In the Court of Appeals of Georgia

A12A1109. DAILEY et al. v. ABDUL-SAMED et al.

MILLER, Presiding Judge.

Ryan S. Dailey and Cindy Dailey brought the instant medical malpractice action against Dr. Gihan Abdul-Samed, PA-C Mark Epps, and ACS Primary Care Physicians-Southeast P. C. (collectively, "the Defendants"),[1] alleging that the Dr. Abdul-Samed and her staff delayed referring Mr. Dailey to a hand surgeon, left his hand injury untreated for a protracted period, and caused a partial amputation of his finger. The Defendants moved for summary judgment on the basis that the Daileys' suit was governed by OCGA § 51-1-29.5 (c) since Mr. Dailey presented to the emergency room, and that the Daileys failed to present clear and convincing evidence

---

[1] The Daileys also named other defendants who had been dismissed from the suit and are not parties to the appeal.

that Defendants' actions were grossly negligent. The trial court granted Defendants' motion for summary judgment, and the Daileys appeal from that order. The Daileys contend that OCGA § 51-1-29.5 is unconstitutionally vague, and that the trial court erred in concluding that the statute insulated Defendants from liability. The Daileys also contend that, even if OCGA § 51-1-29.5 applied, there are still issues of fact as to Defendants' liability, Dr. Abdul-Samed's breach of her fiduciary duty to Mr. Dailey, and whether Defendants' acted in bad faith For the reasons set forth below, we reverse.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.

> When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. Further, any doubts on the existence of a genuine issue of material fact are resolved against the movant for summary judgment. When this Court reviews the grant or denial of a motion for summary judgment, it conducts a de novo review of the law and the evidence.

(Punctuation and footnotes omitted.) *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 685-686 (658 SE2d 233) (2008).

So viewed, the evidence shows that on the night of December 10, 2005, Mr. Dailey inadvertently shot paint thinner into his left-middle finger as he was cleaning a paint spraying device. The tip of Mr. Dailey's finger immediately started hurting. The Daileys went to the emergency room at Spalding Regional Hospital, arriving shortly after midnight on December 11, 2005. Mr. Dailey saw a nurse for an initial assessment at approximately 12:15 a.m. Shortly thereafter, the nurse contacted a poison control center, who informed the nurse to contact a hand surgeon about Mr. Dailey's injury.

Epps next examined Mr. Dailey. Based on the high-pressure injection injury that Mr. Dailey had suffered, Epps concluded that Mr. Dailey needed an immediate referral to a hand surgeon. Sometime before 1:00 a.m., Epps reviewed Mr. Dailey's condition with Dr. Abdul-Samed, who agreed that Mr. Dailey needed an immediate referral to a hand surgeon.

At approximately 1:00 a.m., Dr. Abdul-Samed contacted Dr. John G. Seiler, a hand surgeon at Piedmont Hospital in Atlanta, about possibly transferring Mr. Dailey to Piedmont Hospital in the event Mr. Dailey could not be transferred to a closer

3

facility. At approximately 1:30 a.m., Dr. Abdul-Samed examined Mr. Dailey, confirmed that Mr. Dailey's injury represented a surgical emergency, and informed the Daileys that she would attempt to transfer Mr. Dailey to another hospital with an available hand surgeon.

Dr. Abdul-Samed had the emergency room's unit secretary call hospitals to find a hospital that would accept Mr. Dailey. Although the unit secretary initiated the calls, the actual transfer request was a physician-to-physician discussion. Based on Spalding Hospital's protocol, the unit secretary first called the Atlanta Medical Center at approximately 2:00 a. m. An Atlanta Medical Center physician returned the call approximately 45 minutes later and informed Dr. Abdul-Samed that the hospital was unable to accept Mr. Dailey. Spalding Hospital's protocol required that the next call be made to hospitals in close proximity, including the Medical Center of Central Georgia. While Dr. Abdul-Samed testified that she believed the Medical Center of Central Georgia was called, the Director of the Transfer Center for the Medical Center of Central Georgia stated that the center never received a transfer request. The Medical Center of Central Georgia further stated that it would have accepted a transfer had a request been made since it had an available hand surgeon to treat Mr. Dailey.

4

At some point, the unit secretary called Piedmont Hospital.[2] Dr. Abdul-Samed spoke with Dr. Seiler at Piedmont Hospital in an attempt to transfer Mr. Dailey. Dr. Seiler agreed to accept Mr. Dailey and instructed Spalding Hospital to send Mr. Dailey to Piedmont Hospital "right away." Dr. Abdul-Samed testified that she spoke to Dr. Seiler one to two hours before Piedmont Hospital's official acceptance, which occurred at 7:33 a.m. Dr. Abdul-Samed explained that once the physician accepts the patient, the hospitals must coordinate the transfer, and that a transfer is not official until both parties complete the necessary paperwork. An ambulance arrived at Spalding Hospital about an hour later and delivered Mr. Dailey to Piedmont Hospital at approximately 9:43 a.m. Dr. Seiler subsequently performed surgery on Mr. Dailey, amputating part of Mr. Dailey's finger.

The Daileys filed the instant suit, claiming that Defendants breached their duty of care by not achieving a transfer for Mr. Dailey to a hand surgeon within a timely manner. The affidavit of Mr. Dailey's physician expert stated that Defendants' knew Mr. Dailey's condition would worsen over time, and that their delay in timely transferring Mr. Dailey to a hand surgeon violated the standard of care.

---

[2] The time of this call is not in the record. Dr. Abdul-Samed could not recall what the time the call was made, and conceded that his staff did a "poor" job documenting its calls.

1. The Daileys contend that OCGA § 51-1-29.5 is unconstitutionally vague. Although the Daileys raised this issue below, there is no evidence in the record that the trial court distinctly ruled on their constitutional challenge. Therefore, the constitutional challenge was not preserved for appeal because it was not ruled on below. See *Focus Entertainment Intl., Inc. v. Bailey*, 256 Ga. App. 283, 284 (568 SE2d 183) (2002). "Further, transfer of this appeal to the Supreme Court of Georgia is not warranted because that court does not have exclusive appellate jurisdiction over a case where the constitutional issue asserted on appeal has not been raised in and ruled upon by the trial court." (Citation and punctuation omitted.) Id.[3]

2. The Daileys contend that the trial court erred in granting summary judgment to Defendants because the evidence presents factual questions as to whether OCGA § 51-1-29.5 (c) applied. We agree.

OCGA § 51-1-29.5 (c) provides, in pertinent part, that

---

[3] The Daileys acknowledge that the Supreme Court has upheld the constitutionality of OCGA § 51-1-29.5. See *Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010). The Daileys nevertheless argue that the Supreme Court did not address their vagueness challenge as to the definition of "emergency medical care." In any event, we cannot transfer the case to the Supreme Court for consideration of the Daileys' constitutional claim since the trial court did not distinctly rule on the issue below.

> [i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

"Emergency medical care" has been defined as

> bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5).

While Defendants provided some care to Mr. Dailey upon his arrival to the Spalding Hospital emergency department, it was their alleged lack of emergent care – namely, their delay in timely transferring him to a hand surgeon – that led to this suit. Construing the evidence in a light most favorable to the Daileys, the record shows that Mr. Dailey presented to the emergency room around midnight. At 1:00 a.m., Dr. Abdul-Samed had a conversation with Dr. Seiler about possibly transferring Mr. Dailey to Piedmont hospital for surgery. Around 1:30 a.m, Dr. Abdul-Samed

7

confirmed that Mr. Dailey needed surgery immediately and directed her staff to make calls to other hospitals to initiate transfer requests. Spalding Hospital's unit secretary stated that she could have multiple transfer requests pending at any given time. Despite Dr. Abdul-Samed's prior conversation with Dr. Seiler, there was no attempt, however, to call Piedmont Hospital until sometime after 2:45 a.m., more than an hour after the transfer requests were initiated.

Moreover, while Spalding Hospital's unit secretary averred that generally had to wait for hospitals to return their calls, Dr. Abdul-Samed stated that she spoke to Dr. Seiler one to two hours before the official acceptance, which occurred at 7:30 a.m. In other words, Dr. Abdul-Samed spoke to Dr. Seiler at approximately 5:30 or 6:30 a.m., or three to four hours after Piedmont Hospital was contacted concerning the transfer request. It is not clear from the record what actions Defendants took during this significant period of time in which Dr. Abdul-Samed waited to speak with Dr. Seiler to make the physician-to-physician request. Defendants did not present evidence that other hospitals were contacted, while the Daileys presented evidence that other hand surgeons were available at the time and were not contacted.

More troubling, Spalding Hospital's protocols required that transfer requests be made to nearby hospitals, such as the Medical Center of Georgia. While Dr.

8

Abdul-Samed believed that the Medical Center of Central Georgia was called, there was contrary evidence that no call was made. Significantly, the Medical Center of Central Georgia stated that it never received a call from Spalding Hospital concerning a transfer request for Mr. Dailey, and that it would have accepted a transfer since a hand surgeon would have been available to treat Mr. Dailey. The failure to contact Piedmont Hospital sooner and the failure to contact Medical Center of Central Georgia at all caused an unnecessary delay in providing the required treatment to Mr. Dailey.

The circumstances in this case are similar to those found in *Crewey v. American Medical Response of Ga., Inc.*, 303 Ga. App. 258, 259-261, 263 (692 SE2d 851) (2010), where we ruled that an ambulance company was not entitled to summary judgment after claiming immunity under OCGA § 31-11-8 (a).[4] In *Crewey*, the plaintiff suffered a heart attack and presented to a medical center, where a

---

[4] OCGA § 31-11-8 (a) provides, in relevant part:

Any person, including agents and employees, who is licensed to furnish ambulance service and who in good faith renders emergency care to a person who is a victim of an accident or emergency shall not be liable for any civil damages to such victim as a result of any act or omission by such person in rendering such emergency care to such victim.

9

cardiologist ordered that the plaintiff be transferred to another facility because the medical center did not have the resources to treat the plaintiff. Id. at 259. The medical center contacted an ambulance company, but the ambulance company delayed in providing the necessary transportation. Id. at 259-261. The plaintiff, who suffered significant heart damage, sued the ambulance company alleging that the company was negligent in its failure to provide timely transportation. Id. at 258. We held that the ambulance company was not entitled to emergency-care immunity under OCGA § 31-11-8 because it was the company's failure to provide the requisite care that allegedly led to the increased severity of the plaintiff's heart damage. Id. at 262-263.

As in *Crewey*, the suit in this case is based upon allegations that Defendants failed to provide the requisite emergency care by not transferring Mr. Dailey to a hand surgeon in a more timely manner. Viewing the record evidence in a light most favorable to the Daileys, the evidence shows that Mr. Dailey's prognosis worsened with the delay. While we express no opinion as to the question of Defendants' liability, we conclude that there are factual questions as to Defendants actions during the time Mr. Dailey remained in the emergency room. The mere fact that Mr. Dailey remained in the emergency department while Defendants allegedly delayed in providing Mr. Dailey the requisite care does not automatically invoke application of

OCGA § 51-1-29.5 (c). Although the evidence reflects that Mr. Dailey presented to the emergency room with an emergency condition, a question of fact exists as to whether Defendants' actions in delaying necessary treatment constituted emergency medical care under OCGA § 51-1-29.5 (c), and the trial court erred in granting summary judgment to Defendants on this basis.

3. In light of our disposition of Division 2, we need not consider the Daileys' remaining enumerations of error.

*Judgment reversed. Ray, J., concur specially and Branch, J., concur in judgment only.*

A12A1109. DAILEY v. ABDUL-SAMED.

RAY, Judge, concurring specially.

On reconsideration I find it necessary to write separately because, although I agree with the trial court's order granting summary judgment must be reversed, I do so for a different reason than that expressed by the majority.[1]

Specifically, I disagree with Division 2 of Presiding Judge Miller's opinion holding that a question of fact exists as to whether the Defendants' actions in delaying necessary treatment constituted emergency medical care under OCGA § 51-1-29.5 (c).

In the present case, while the Defendants provided some care to Mr. Dailey upon his arrival to the Spalding Regional Hospital emergency department, it was their alleged lack of emergent care – namely, their delay in timely transferring him to a hand surgeon – that led to this suit. The Daileys argue, and Presiding Judge Miller's opinion agrees, that a question of fact remains as to whether OCGA § 51-1-29.5 applies in the present case and whether the Defendant's efforts to secure Mr. Dailey's transfer to another hospital with an available hand surgeon constituted the "provision

_____

[1] The majority opinion thus decides only the issues in this case and may not be cited as binding precedent pursuant to Court of Appeals Rule 33 (a).

of emergency care." Because I believe that the record shows that Mr. Dailey's injury continued to be an emergency until he received surgery at Piedmont Hospital, I disagree.

When considering the meaning of a statute, we apply the following analysis:

First, courts should construe a statute to give sensible and intelligent effect to all of its provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless. Second, a court's duty to reconcile, if possible, any potential conflicts between different sections of the same statute, so as to make them consistent and harmonious. Third, in construing the language of any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole.[2]

With these principles in mind, we note that OCGA § 51-1-29.5 imposes a heightened burden of proof and lower standard of care only for health care liability claims arising from the provision of "emergency medical care."[3] Subsection (a) (5) of the statute defines "[e]mergency medical care" as

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient

---

[2] (Citation omitted.) *Fulton County v. Colon*, 316 Ga. App. 883, 887 (2) (730 SE2d 599) (2012).

[3] OCGA § 51-1-29 (c).

2

severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment after the patient is stabilized and is capable of receiving treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

The plain language of this statute indicates that services provided by the Defendants were to be deemed "emergency medical care" until such time that Mr. Dailey was stabilized, and the absence of such services would not place his health or the proper functioning of his hand in serious jeopardy. The record shows that Mr. Dailey's injury was not stabilized by the medical care he received at Spalding Regional Hospital, and that his injury continued to require emergency care that could only be provided by timely transferring him to another hospital. Specifically, he required surgery as soon as possible in order "to minimize the degree of secondary injury to the soft tissues" in his hand.

Further, "it is elementary that in all interpretations of statutes, the courts shall look diligently for the intention of the legislature, and such intent shall be determined

3

from a consideration of the entire statute."[4] It is clear from a consideration of the subsection (a) of the emergency medical care statute, OCGA § 51-1-29.5, that the legislature anticipated that a "[h]ealth care liability claim" arising out of the provision of emergency medical care in a hospital emergency department could include a claim against a health care provider or physician for departures from accepted standards of "professional or administrative services directly related to health care, which departure from standards proximately results in injury or death of a claimant."[5] Defendants' efforts to locate an available hand surgeon and coordinate a timely transfer of Mr. Dailey so that he might receive emergency surgery are certainly administrative services that fall under the category of "emergency medical care."

---

[4] (Citation and punctuation omitted.) *Dept. of Human Resources v. Hutchinson*, 217 Ga. App. 70, 72 (1) (456 SE2d 642) (1995).

[5] Specifically, OCGA § 51-1-29.5 (a) (9) provides: "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care, which departure from standards proximately results in injury to or death of a claimant." The statute then defines "[p]rofessional or administrative services" as "those duties or services that a physician or health care provider is required to provide as a condition of maintaining that physician's or health care provider's license, accreditation statute, or certification to participate in state or federal health care programs." OCGA § 51-1-29.5 (a) (18).

I concur in the judgment reversing the trial court's grant of summary judgment, however, because I believe that there exists a question of fact as to whether the claimants have demonstrated by clear and convincing evidence that the Defendants' actions in locating and transferring Mr. Dailey to a hospital with an available hand surgeon constituted gross negligence under OCGA § 51-1-29.5 (c).[6] The record shows that Dr. Abdul-Samed concluded that Mr. Dailey needed hand surgery and that such a surgeon was not available at Spalding Hospital by 1:30 a.m., but that Mr. Dailey was not transferred to Piedmont Hospital until after 9:43 a.m. Although Dr. Abdul-Samed instructed her staff to make calls to other hospitals to initiate transfer requests, the majority correctly notes that there is conflicting evidence in the record as to what efforts were made to locate available hand surgeons in nearby hospitals, particularly the Medical Center of Central Georgia. Further, the record contains little evidence to explain the significant delay in transferring Mr. Dailey to Piedmont Hospital. Accordingly, I concur in the majority's opinion in judgment only.

---

[6] Gross negligence has been defined as "equivalent to the failure to exercise even a slight degree of care, or lack of diligence that even careless men are accustomed to exercise." *Johnson*, supra.

5