294 Ga. 758
FINAL COPY

S13G0657.  ABDEL-SAMED et al. v. DAILEY et al.

THOMPSON, Chief Justice.

We granted a writ of certiorari in <u>Dailey v. Abdul-Samed</u>, 319 Ga. App. 380 (736 SE2d 142) (2012),[1] to determine whether the Court of Appeals erred in this medical malpractice action by reversing the trial court's grant of summary judgment in favor of the defendants.[2]  Because we conclude there exists a question of fact for jury determination, and therefore, the defendants were not entitled to summary judgment, we affirm.

Viewed in a light most favorable to the non-moving parties, Ryan and Cindy Dailey, the evidence shows that Ryan Dailey arrived at Spalding Regional

---

[1]  It appears Dr. Abdel-Samed was inadvertently referred to as Dr. Abdul-Samed in the Court of Appeals.  Because she has been identified in this Court as Dr. Abdel-Samed, we refer to her by that name.

[2]  The amended complaint named as defendants emergency room doctor Gihan Abdel-Samed, physician's assistant Mark Epps, and ACS Primary Care Physicians Southeast, P.C., which employed Epps and contracted with Dr. Abdel-Samed for the provision of professional services at Spalding Regional Medical Center.  Claims against the medical center were dismissed with prejudice by consent of the parties.

Medical Center (SRMC) just after midnight on December 11, 2005, seeking treatment after he accidentally shot paint thinner into his finger with a high pressure paint sprayer. Mark Epps, a physician's assistant, examined Ryan and concluded he needed an immediate referral to a hand surgeon and emergency surgery. SRMC did not have a hand surgeon on call, and Epps told Ryan and his wife, Cindy, that the on-call orthopedic surgeon did not like to be disturbed during the night. As a result, Epps stated surgery would have to wait until the morning. Meanwhile, Dr. Abdel-Samed, who had been informed of Ryan's presence in the emergency room and of Epps' diagnosis, was talking to Dr. John Seiler, a hand surgeon at Piedmont Hospital, about a different hand surgery patient she was transferring to him. In the course of this conversation, Dr. Abdel-Samed mentioned that she might have a second hand surgery patient, i.e., Ryan, to send him. Dr. Seiler responded that he would be willing to take and treat Ryan.

Dr. Abdel-Samed first examined Ryan at approximately 1:00 a.m. and agreed with Epps' conclusion that immediate surgery was necessary. Nevertheless, the Daileys stated in deposition testimony that Dr. Abdel-Samed told them surgery would have to wait until the next morning when the on-call

1

orthopedic surgeon arrived. Dr. Abdel-Samed then encouraged Cindy to go home and wait, moved Ryan into a small storage room, and turned off the lights. Hospital staff checked on Ryan periodically throughout the early morning, noting that he continued to complain of pain in his finger and hand. Hospital records indicate a breakfast tray was ordered for Ryan at 6:30 a.m.

Epps testified that he spoke with Dr. Abdel-Samed about Ryan's diagnosis before 1:00 a.m., that he made no effort to transfer Ryan to a hand surgeon, and that he spoke with Dr. Abdel-Samed again at 3:00 a.m. when his shift was ending, but he had no recollection of what was said in that conversation. Dr. Abdel-Samed testified that after she examined Ryan, she gave a general instruction to hospital staff to transfer him to an available hand surgeon. The unit secretary was unable to recollect which hospitals, if any, were called or when. Instead, she testified as to her normal practice, which was to call Atlanta Medical Center (AMC) and the Medical Center of Central Georgia (MCCG), hospitals affiliated with SRMC. Dr. Abdel-Samed testified that based on hospital protocol, she believed AMC and MCCG had been called, but neither

2

had a hand surgeon available.[3] There is other evidence, however, showing that MCCG was not called and that it had a hand surgeon on call and available to perform surgery on the morning in question.

It is undisputed that at 7:33 a.m., seven-and-a-half hours after Ryan arrived at SRMC, Dr. Seiler was called and Ryan was accepted for transfer. Ryan arrived at Piedmont Hospital at approximately 9:45 a.m., where emergency surgery was performed through use of nerve blocks instead of general anesthesia.[4]

The Daileys filed suit, claiming Dr. Abdel-Samed and Epps breached their duties of care by not transferring Ryan to a hand surgeon in a timely manner. They contend the delay resulted in amputation of the tip of Ryan's middle finger and reduced range of motion and increased pain and sensitivity in his finger and hand. Dr. Abdel-Samed and Epps moved for summary judgment, relying, in part, on their contention that the Daileys' claims are controlled by OCGA § 51-

---

[3] It is undisputed that Dr. Abdel-Samed knew from her experience with the first patient in need of hand surgery that AMC did not have a hand surgeon on call the morning of December 11, 2005.

[4] The Daileys' expert suggested general anesthesia may not have been used both because of the immediate need for surgery and because Ryan was given breakfast at SRMC.

1-29.5, which places a higher evidentiary burden on plaintiffs asserting certain health care liability claims arising out of the provision of emergency medical care. The trial court granted summary judgment in favor of the defendants, and the Court of Appeals reversed, concluding that an issue of fact exists regarding the applicability of OCGA § 51-1-29.5 (c). Dailey, supra, 319 Ga. App. at 386.

1. Our review of the grant or denial of summary judgment is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. See Johnson v. Omondi, 294 Ga. 74, 75 (751 SE2d 288) (2013); Bonner v. Southern Restaurant Group, 271 Ga. App. 497 (610 SE2d 129) (2005). Summary judgment is warranted only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Once the movant has made a prima facie showing that it is entitled to judgment as a matter of law, the burden shifts to the respondent to come forward with rebuttal evidence. Id.

Relying on Crewey v. American Medical Response of Ga., 303 Ga. App. 258 (692 SE2d 851) (2010), the Court of Appeals reversed the trial court's grant of summary judgment based on its determination that a question of fact exists as to whether the medical provider defendants' actions in delaying necessary

4

treatment constituted emergency medical care under OCGA § 51-1-29.5 (c).

That subsection provides, in pertinent part:

> In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c). "Emergency medical care" is defined in OCGA § 51-1-29.5 (a) (5) as

> bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

Considering the plain language of these provisions and the uncontradicted evidence pertaining to Ryan's medical condition, we find no dispute as to whether the care provided by the defendants constituted emergency medical care. The parties and the Daileys' medical expert agree that Ryan presented at the emergency room with a high pressure puncture wound to his hand that

5

required emergency surgery to minimize the degree of secondary injury in his hand and forearm. All further agree that defendants had a duty within the medical standard of care to attempt to locate an available hand surgeon in a timely manner, including by transfer to another medical facility with an available hand surgeon if necessary. Contrary to the Daileys' argument, there is no evidence in the record that Ryan's medical condition had stabilized so as to render him capable of receiving medical treatment as a nonemergency patient. See OCGA § 51-1-29.5 (a) (5). The fact that Ryan's need for emergency surgery was "not changing or fluctuating" is not evidence that his medical condition had stabilized to the point that he no longer required emergency treatment to avoid serious injury. In fact, the Daileys' claims are based on their contention, a contention not disputed by defendants, that at all relevant times Ryan remained in need of emergency surgery.[5]

Because the evidence on summary judgment establishes without dispute that Dr. Abdel-Samed's and Epps' actions were taken after the onset of a

---

[5] Nor can we agree with the Daileys' contention that although Ryan's condition was worsening as he waited for surgery, he was stable because the defendants did not treat him like he was in crisis. The definition of emergency medical care depends on the actual medical condition of the individual patient, not the manner in which such condition is treated. See Bonds v. Nesbitt, 322 Ga. App. 852, 855 (747 SE2d 40) (2013).

6

medical or traumatic condition causing severe pain such that the absence of medical attention could reasonably be expected to result in placing Ryan's health in serious jeopardy or in serious dysfunction to his hand, we find the Court of Appeals erred by finding a question of fact as to the applicability of OCGA § 51-1-29.5 (c).

The Court of Appeals' reliance on Crewey was misplaced, as that case is both factually and substantively distinguishable. The plaintiff in Crewey suffered a heart attack and required an emergency transfer from the medical center where he presented to another facility. The medical center called an ambulance company, American Medical Response (AMR), but AMR had no ambulances available. Eventually, another ambulance service was contacted, and Crewey was transferred. Crewey sued AMR, alleging it was negligent in its efforts to transfer him and as a result of the delay, he suffered severe heart damage. AMR sought summary judgment, contending it was immune from civil liability as an emergency care provider pursuant to OCGA § 31-11-8 (a), a statute which grants immunity to licensed ambulance services and their agents and employees who in good faith render emergency care to a person who is the victim of an accident or emergency. The trial court granted the motion, and the

7

Court of Appeals reversed, concluding that "AMR did not render 'emergency care' as contemplated by OCGA § 31-11-8 (a). To the contrary, it was AMR's inability to provide Crewey with the necessary emergency care . . . that led to the series of events in question." (Footnote omitted.) Id. at 263. Thus, the statutory immunity sought by AMR and granted by OCGA § 31-11-8 (a) to those who provide ambulance services in an emergency situation did not apply in Crewey because the plaintiff's negligence claims were based on allegations that the ambulance company provided no emergency services.

In contrast, the evidence in this case demonstrates that Dr. Abdel-Samed and Epps provided emergency medical services to Ryan through their examination and diagnosis of his medical condition and their efforts to transfer him to a hand surgeon. Moreover, unlike in Crewey, it is undisputed that these defendants had a duty under the applicable standard of medical care to attempt to locate an available hand surgeon to perform the required emergency surgery. The Daileys' claims, therefore, are based on clear allegations that the provided emergency medical services failed to meet the applicable standard of care, thereby rendering OCGA § 51-1-29.5 (c) applicable. See Bonds v. Nesbitt, 322 Ga. App. 852 (1) (747 SE2d 40) (2013). See also OCGA § 51-1-29.5 (a) (7)

8

(defining "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished"); OCGA § 51-1-29.5 (a) (9) (defining "health care liability claim" to include a cause of action against a physician or health care provider for treatment or lack of treatment).

2. Although not addressed by the Court of Appeals, the Daileys further argued that summary judgment was not warranted because there exists a question of fact as to whether the defendants provided "bona fide emergency services." OCGA § 51-1-29.5 (a) (5). They urge us, as they did the Court of Appeals, to construe the phrase "bona fide emergency services" to render OCGA § 51-1-29.5 (c) applicable only to those cases in which emergency medical services are provided honestly or in good faith. Completing the argument, the Daileys posit that Dr. Abdel-Samed and Epps did not provide the emergency medical services in good faith, and therefore, they are not entitled to claim the heightened protection set forth in OCGA § 51-1-29.5 (c).

In the interpretation of all statutes, the courts shall look diligently for the intention of the General Assembly. OCGA § 1-3-1 (a). Legislative intent is determined from consideration of the entire statute; thus we consider a statutory provision not in isolation, but in the context of the other statutory provisions of

9

which it is a part.  Hendry v. Hendry, 292 Ga. 1, 3 (734 SE2d 46) (2012).  In this instance, the legislature chose not to define "bona fide" within OCGA § 51-1-29.5.  Nor is it defined elsewhere in the Torts section of the Georgia Code.  It is, however, a phrase of general usage and must be given its ordinary meaning.  See OCGA § 1-3-1 (b).  The American Heritage Dictionary defines "bona fide" as "made or carried out in good faith," "authentic," or "genuine."  American Heritage Dictionary 214 (3rd ed. 1992).  Webster's Dictionary similarly defines "bona fide" as "real or genuine," "made or done in an honest and sincere way."  Merriam-webster.com, http://www.merriam-webster.com/dictionary/bonafide.  Black's Law Dictionary defines the term to mean both "in good faith" or "sincerely" and "truly, actually" but recognizes that "bona fide" often is used ambiguously and may describe either something that is real or true or something that is "without notice of any fraud."  Thelawdictionary.org, http://www.thelawdictionary.org/bonafide.  See also Black's Law Dictionary 168 (7th ed. 1999).  Strict dictionary definitions thus suggest two possible meanings for the term "bona fide," either "in good faith" or "genuine" and "true."

In construing language used in a statute, however, we also must consider

10

the context in which a phrase is used and the legislative intent behind enactment of the statute. See Restina v. Crawford, 205 Ga. App. 887, 888 (424 SE2d 79) (1992). In the context of OCGA § 51-1-29.5 (a) (5), "bona fide" is used as an adjective to describe the type of emergency medical services to which the heightened protections of OCGA § 51-1-29.5 (c) shall apply. OCGA § 51-1-29.5 itself was enacted as part of the Tort Reform Act of 2005, Ga. L. 2005, pp. 1, 11-13, § 10, a legislative effort intended to promote affordable liability insurance for health care providers and hospitals and thereby promote the availability of quality healthcare services. Ga. L. 2005, pp. 1-2, § 1. As part of this effort, the focus of OCGA § 51-1-29.5 (a) (5) is on the definition of "emergency medical care" and reflects a legislative intent to provide greater protection from liability to physicians and health care providers who provide genuine emergency medical care. This interpretation is borne out by the second sentence of subsection (a) (5) which addresses when an "emergency" dissipates.

In arguing that "bona fide" should be read to mean "good faith," the Daileys focus exclusively on the actions or inactions of Dr. Abdel-Samed and Epps, arguing that their actions or inactions show that they did not act in good faith. But OCGA § 51-1-29.5 (a) (5) does not once mention health care

11

providers or their actions. When the legislature wants to limit an individual's tort liability based on good faith actions, it appears to do so by describing the individuals in question and by specifically saying that they must act in good faith. Many of these Code sections are in the same chapter of the Georgia Code as OCGA § 51-1-29.5. See, e.g., OCGA § 51-1-20 (a) ("A person serving with or without compensation as a member, director, or trustee, or as an officer of the board without compensation, of any nonprofit hospital or association or of any nonprofit, charitable, or eleemosynary institution or organization or of any local governmental agency, board, authority, or entity shall be immune from civil liability for any act or any omission to act arising out of such service if such person was acting in good faith within the scope of his or her official actions and duties and unless the damage or injury was caused by the willful or wanton misconduct of such person."); OCGA § 51-1-29 ("Any person, including any person licensed to practice medicine and surgery pursuant to Article 2 of Chapter 34 of Title 43 and including any person licensed to render services ancillary thereto, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof without making any charge therefor shall not be liable for any civil damages as a result of any act or

omission by such person in rendering emergency care or as a result of any act or failure to act to provide or arrange for further medical treatment or care for the injured person."); OCGA § 51-1-30.2 ("Teachers and other school personnel shall be immune from any civil liability for communicating information in good faith concerning drug abuse by any child to that child's parents, to law enforcement officials, or to health care providers."); OCGA § 31-11-8 (a) ("Any person, including agents and employees, who is licensed to furnish ambulance service and who in good faith renders emergency care to a person who is a victim of an accident or emergency shall not be liable for any civil damages to such victim as a result of any act or omission by such person in rendering such emergency care to such victim"). That the General Assembly did not use this familiar language in OCGA § 51-1-29.5 belies the notion that they intended "bona fide" to describe the actions of health care providers.

Accordingly, considering the phrase "bona fide emergency services" in its proper context, we find "bona fide emergency services" to mean genuine or actual emergency services. Because there is no disputed question of fact in this case that the defendants provided actual emergency care, see Division 1, supra, the heightened evidentiary burden found in OCGA § 51-1-29.5 (c) applies, and

13

this issue did not preclude the grant of summary judgment.

3. Having determined that the undisputed evidence demonstrates the applicability of OCGA § 51-1-29.5 (c) to the Daileys' claims, we must determine whether there exists a question of fact regarding their claim of gross negligence. With proper application of OCGA § 51-1-29.5 (c), the Daileys would bear the burden at trial of proving by clear and convincing evidence that the defendants were grossly negligent by failing to transfer Ryan to a hand surgeon in a timely manner. See OCGA § 51-1-29.5 (c); Johnson, supra. Summary judgment in favor of the defendants, therefore, would be appropriate only if, viewing the record evidence in a light most favorable to the Daileys, there was no genuine issue of fact and the medical defendants showed that a reasonable jury could not find gross negligence by clear and convincing evidence. "Gross negligence" is defined as

> the absence of even slight diligence, and slight diligence is defined in [OCGA § 51-1-4] as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." [Cit.]

Gliemmo v. Cousineau, 287 Ga. 7, 12-13 (694 SE2d 75) (2010). See OCGA § 51-1-4. Applying this definition in the context of a medical malpractice action

14

brought pursuant to OCGA § 51-1-29.5 (c), liability would be authorized where the evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the defendants caused harm by grossly deviating from the applicable medical standard of care. See Johnson, supra, 294 Ga. at 82-83 (Blackwell, J., concurring). As a general rule, "[w]hen facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable [people] as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury." (Citation and punctuation omitted.) Trustees of Trinity College v. Ferris, 228 Ga. App. 476, 477 (1) (491 SE2d 909) (1997). See Currid v. DeKalb State Court Probation Dept., 274 Ga. App. 704, 709 (2) (618 SE2d 621) (2005).

Viewed in the proper manner, the evidence of record shows that Ryan was diagnosed by Dr. Abdel-Samed and Epps before 1:00 a.m. with a high velocity puncture wound that required emergency surgery. Dr. Abdel-Samed and Epps both testified that Ryan required emergency surgery. The Daileys submitted expert testimony that Dr. Abdel-Samed's and Epps' actions, if any, in

15

attempting to transfer Ryan to a hand surgeon did not meet the medical standard of care under like circumstances because Dr. Abdel-Samed and Epps either made no effort to transfer Ryan to a hand surgeon or waited 5.5 hours to contact Dr. Seiler after learning that no other hand surgeon was available.[6] Even applying the heightened evidentiary burden imposed by OCGA § 51-1-29.5 (c), from this evidence a jury could find clear and convincing evidence that defendants acted with gross negligence in their efforts to transfer Ryan to a hand surgeon.[7]

The defendants argue a jury could not find gross negligence because they exercised at least slight diligence in caring for Ryan. They point to Dr. Abdel-

---

[6] The Daileys' expert specifically opined that the calls Dr. Abdel-Samed claims were made to other hospitals would have been completed within one hour of Ryan's 1:00 a.m. diagnosis and that Dr. Abdel-Samed's failure to make any effort between 2:00 a.m. and 7:33 a.m. to transfer Ryan to a hand surgeon, especially when she knew of the availability of Dr. Seiler, constituted gross negligence and a gross deviation from the applicable standard of medical care.

[7] As recently stated in Johnson, supra, 294 Ga. at 77,
[w]hen faced with such a heightened burden, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. . . . [cit.] The appropriate summary judgment question is 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown [the required element] by clear and convincing evidence or that the plaintiff has not.'"
(Citation omitted.)

16

Samed's testimony that she directed the emergency room unit secretary to seek a transfer to a hand surgeon and after another hand surgeon could not be found, she contacted Dr. Seiler. There is also evidence, however, that no call was made to MCCG, where a hand surgeon was available on the morning in question. Moreover, as stated, even assuming the telephone calls were made, this evidence would not contradict the undisputed evidence that Dr. Abdel-Samed at 1:00 a.m. believed that Ryan needed emergency surgery and that no hand surgeon was available at MCCG or AMC and she knew that Dr. Seiler was available to accept Ryan for surgery, yet she took no additional action to effectuate a transfer until she called Dr. Seiler at 7:33 a.m.[8] In light of this evidence, we cannot say the evidence precludes a finding that Dr. Abdel-Samed and/or Epps grossly deviated from the applicable medical standard of care in the treatment of Ryan's medical condition.

In summary, although we find no question of fact pertaining to the

---

[8] We note in this regard that the Daileys' expert witness testified that had Dr. Abdel-Samed used her best efforts to locate a hand surgeon but one had not been available, her conduct would not have deviated from the applicable standard of care. Similarly, he opined that he considered it within the appropriate standard of care for a medical doctor to delegate to emergency room staff the responsibility of calling other hospitals in search of an available hand surgeon.

17

applicability of OCGA § 51-1-29.5 to the Daileys' claims, the Daileys have shown facts sufficient to raise a jury question as to gross negligence on the part of the defendants.  See Currid, supra, 274 Ga. App. at 709 (2); Trustees of Trinity College, 228 Ga. App. at 477-478.  Accordingly, the evidence presented was sufficient to preclude the grant of summary judgment in favor of the defendants on this ground, and the decision of the Court of Appeals is affirmed.

Judgment affirmed.  All the Justices concur.

Decided March 10, 2014.

Certiorari to the Court of Appeals of Georgia – 319 Ga. App. 380.

Carlock, Copeland & Stair, Thomas S. Carlock, Eric J. Frisch, for appellants.

Reynolds, Horne & Survant, W. Carl Reynolds, Bradley J. Survant, for appellees.

18