**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 28, 2024**

# In the Court of Appeals of Georgia

A24A0546. BAILEY et al. v. MAKE A DIFFERENCE MINISTRIES, INC.

PIPKIN, Judge.

Appellant Catherine Bailey brought a negligence action[1] against Appellee Make a Difference Ministries, Inc. d/b/a Camp Highland ("Camp Highland") seeking damages for injuries she received while attempting to evacuate Camp Highland's "Teams Course" during a bout of intense rain.[2] Camp Highland later filed a motion for summary judgment, contending that Bailey's claims were barred by a Medical/Liability Release Form ("Release") Bailey signed before she attempted the

---

[1] Bailey's husband Steven also asserted a claim for loss of consortium.

[2] The Teams Course will also be referred to as the "Course." As discussed more in this opinion, the Teams Course is a two-level elevated structure consisting of various "challenge" elements that participants navigate with a partner.

Course; consequently, Bailey amended her complaint to assert claims for gross negligence. Following a hearing, the trial court granted Camp Highland's motion, and Bailey filed this appeal. We now affirm in part and reverse in part.

Pertinent here, the record shows that in September 2018, Bailey was employed as a high school teacher at Shiloh Hills Christian School ("School"). The School had planned an overnight trip to Camp Highland for its junior and high school students, and Bailey was acting as a chaperone for the high school students who were in their senior year. The students and chaperones arrived at Camp Highland on Wednesday, September 26, 2018, and spent the day participating in various activities. On the second day, the high school students were scheduled to navigate the top level of the Course.[3] However, after observing the top level of the Course, some students chose not to participate, leaving an uneven number of students who wanted to attempt the

---

[3] Our facts are derived primarily from the parties' depositions. In some instances, the depositions were video recorded and in almost all instances photographs of the Course structure were used during the depositions to allow the deponents to point to different areas or explain their testimony in the context of the photographs. We, however, have been provided with only the transcribed versions of the depositions, which lack the context of the descriptions that were given while using visual aids. Although this has not impacted our analysis, it may have caused us to be less than precise in our descriptions of the Course.

Course. Bailey then volunteered to partner with one of the female students so the student could participate in the activity.

Prior to beginning the Course, the participants were instructed on how to use the safety equipment, which consisted of a safety helmet and a harness attached to a rope or "lanyard" that the participants would clip to a metal safety line running throughout the elements of the Course. The Course was designed so that participants had to unclip and then reattach their lanyard as they moved from one element to the next, and the partners had to work together to make sure their partner always remained tethered to the safety cable by at least one lanyard. The Course also had cargo nets on both ends, and these nets were used both as points of ingress and egress; participants could also exit the course via a zip line or be lowered or belayed down a rock climbing wall. Participants could navigate the Course in either direction, and the participants who were attempting only the top level, as was the situation with the School group, usually entered the Course via the shorter of the two cargo nets and they usually exited the course via the zip line or were belayed down the rock climbing wall.[4] Additionally, it was not unusual for participants who quit the Course before

_____

[4] Participants who were attempting only the lower level would typically enter at the long cargo net end and descend at the short cargo net end.

completing it and camp personnel to use the short cargo net to exit the Course from the top level. Participants were also instructed on how to lengthen or shorten their safety ropes and whether they left it longer or later shortened it while traversing the various elements generally depended on their level of comfort – a longer length provided more mobility and made it easier to work with their partner to navigate certain elements while a shorter length provided a greater feeling of security. However, while the rope length was generally left to the discretion of the participants, participants were usually instructed to make their rope longer when they were ascending the short cargo net at the beginning of the course.

Although the participants were instructed on how to handle the safety equipment, they were not provided with any instruction on how to complete the various Course elements because part of the "challenge" was for participants to work as a team to complete the elements under somewhat stressful circumstances – high up in the air, tethered only by ropes to a safety line. However, trained camp personnel, known as facilitators, were stationed along the Course to oversee the participants. As set forth in the Camp Highland Operations Manual, participants were not allowed on the Course without a facilitator, and facilitators were to provide constant supervision

4

of the participants while they navigated the Course. To ensure that this happened, facilitators were positioned along the Course so that every participant could be seen by at least one facilitator. More specifically, the job of the facilitators was to assist the participants in entering and exiting the Course, to ensure that the participants were following safety protocols, and to assist any participant who might encounter difficulty as they navigated the Course. On the day Bailey was injured, four facilitators had been assigned to oversee the students– a "lead-in" facilitator who oversaw the participants as they entered the Course via the short cargo net, two "in-course" facilitators who were stationed along the various elements, and one "lead" facilitator, who was stationed on the tower where the zip line was located.

Because Bailey and her partner were the last to pair up, they were also the last to enter the Course. Miriam Camp, the lead-in facilitator,[5] assisted their entry, the first step of which was climbing up the short cargo net in a stomach down position. They then moved to a platform on the lower level of the course, where another facilitator was waiting. They waited for a pair of participants who had changed their mind about attempting the Course to come back down, and then they climbed an

---

[5] Miriam Camp testified in her deposition that once all the participants were on the course, she retreated to a shed under the tower.

incline ramp to reach the top level of the Course. Although it had been raining intermittently earlier in the day, it was not raining when they began the Course. However, Bailey testified that by the time they were waiting at the platform it had begun to "heavily drizzle" and that, as she and her student partner reached the top level, the intensity of the rain increased, fog-like conditions developed, and visibility deteriorated, which, she said, was exacerbated by rainwater dripping off their helmets and eyelashes.

Bailey testified that when she and her partner reached the second element on the top level, which consisted of a sliding platform, she felt "unstable" and "unsafe" so she shortened her safety lanyard. The rain had increased in intensity by this time, and Coleman Poje, who was the lead facilitator that day, made the decision to evacuate the Course. Poje said in his deposition that he made this decision because it was raining too hard for the participants to comfortably complete the Course, and he and other witnesses testified that they did not consider the evacuation to be an emergency situation because there was no lightning in the area. However, one of the facilitators testified that, due to the intensity of the rain, she considered the evacuation to be an emergency situation.

Although Camp Highlands did not have a written Course evacuation plan, the general protocol was for the participants to go to the nearest exit point since the goal was to get people off the Course as quickly as possible. Because Bailey and her student partner had been the last to enter the Course, they were the team closest to the beginning, i.e., the short cargo net, and Poje yelled at them to turn around and go back that way. The other participants who were still on the Course were closer to the zip line, and Poje had instructed them to keep going that way, where they could also be belayed down the climbing tower by the staff.

As instructed, Bailey and her partner turned around to go back toward the short cargo net. Although a facilitator should have accompanied each group, and Bailey had seen a female staff member in her vicinity earlier, she did not see any staff members near her position as she began to navigate the Course in the direction of the short cargo net.[6] Brittany Blocker, who was the in-course facilitator stationed closest to Bailey, testified that she also made her way back to the short cargo net so that she could exit the Course, but that she did not see Bailey and her partner or any other

---

[6] Bailey testified that at one point she saw a male individual "swinging like Tarzan" along the side of the elements and she yelled at him to stop, but he did not appear to hear her, and he kept going and then disappeared out of sight.

participants along the way, so she thought that everyone had made it off the Course. Blocker also testified in her deposition that she may not have seen Bailey on the Course because of the weather. Believing the Course to be empty, Blocker exited the Course and walked to the tower area to assist with storing equipment. It appears to be undisputed that the only procedure Camp Highland used to ensure that everyone had been evacuated from the Course was for the facilitators to perform an informal visual inspection but there was no evidence that a specific facilitator was assigned to perform the inspection or that there was any procedure in place to make sure that someone had in fact checked that the Course was clear.

Shortly after Blocker exited the Course,[7] Bailey and her partner made it back to the short cargo net. Bailey testified that her priority was to protect the student she was with, so when they reached the short cargo net and realized no one was there to help, she decided to descend the net and then go find someone to help the student down the net. She testified that she first attempted to descend the cargo net as if she was climbing down a ladder, but that her shortened safety rope prevented her from doing so and that, when she attempted to lengthen it, she was unable to manipulate the rope

---

[7] Blocker estimated that she was on the ground for less than five minutes when Bailey was injured.

due to the rope being wet and her hands being wet and cold. She then decided to walk face first down the net, but her foot slipped and, because her safety line was too short, she started sliding down the cable that ran the length of the structure in front of the cargo net as if it were a zip line. Bailey grabbed the cable to slow her descent, but she had to let go because the metal "burned" her hand and pieces of metal were being embedded into her hand. Bailey said that, as she was going down the cable, she rolled into a ball to protect her body and that this caused her to rotate slightly and slam into a wooden beam behind her. She bounced off the beam and then struck it again; she then fell to the ground and briefly lost consciousness. Bailey was transported to the hospital, where it was determined that she had numerous fractures in her lower back, extensive bruising to parts of her body, a misalignment of her SI joint located on the base of her spine, and burns on her hand. At the time of her deposition two years later, Bailey was still undergoing treatment and more surgeries were anticipated. Bailey continued to experience problems functioning in almost all aspects of her life, and due to her mobility and other issues, could not work, go out in public by herself, drive her children, or otherwise care for her family.

2. Having set out the relevant facts, we now turn to the legal analysis. There is no dispute that Bailey waived any claims she might have had for simple negligence by executing a valid release.[8] See *Barbazza v. Intl. Motor Sports Assn.*, 245 Ga. App. 790, 792 (2) (538 SE2d 859) (2000). However, while it is well-settled that a release such as the one Bailey signed shields a tortfeasor from claims of simple negligence, it is equally well-established that a party may recover for acts of gross negligence even when claims of simple negligence have been waived. Id. at (3); *Trustees of Trinity College v. Ferris*, 228 Ga. App. 476, 476 (1) (491 SE2d 909) (1997).

Our Supreme Court has defined gross negligence as follows:

---

[8] The Release Bailey signed stated as follows:

Camp Highland . . . is an adventure challenge camp that provides voluntary participation in strenuous and potentially dangerous activities. The risk of injury from the activities involved in this program is significant, including the potential for permanent paralysis and death, and while the rules, equipment and personal discipline may reduce the risk of serious injury, the potential of injury/death does exist. I assume full responsibility for my . . . participation. . . . I, for myself, or on behalf of my . . . heirs, assignors and personal representatives do hereby release and hold harmless Camp Highland, . . . [and] release Camp Highland with respect to any and all injury, disability, death, or loss of damage to personal property.

10

[G]ross negligence is the absence of even slight diligence, and slight diligence is defined in OCGA § 51-1-4 as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence has been defined as the equivalent to the failure to exercise even a slight degree of care or lack of the diligence that even careless men are accustomed to exercise.

(Punctuation omitted.) *Johnson v. Omondi*, 294 Ga. 74, 77-78 (751 SE2d 288) (2013). See also *Georgia Trails & Rentals v. Rogers*, 359 Ga. App. 207, 217 (3) (c) (855 SE2d 103) (2021) (same).

"When facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable men as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury." (Citation and punctuation omitted.) *Georgia Trails*, 359 Ga. App. at 217 (3) (c). See also *Trinity College*, 228 Ga. App. at 478 (1). However, "[i]n cases wherein the evidence allegedly supporting the accusations of gross negligence is plain and indisputable, . . . the court may resolve the questions of whether the defendant acted with gross negligence as a

11

matter of law." (Citations omitted.) *Newton v. Jacobs*, 358 Ga. App. 180, 186 (2) (854 SE2d 359) (2021). See also *Johnson*, 294 Ga. at 78 (same).

Here, there is no real dispute that Camp Highland was negligent to some degree in leaving Bailey and her partner on the Course without supervision in violation of Camp policies, and, in granting summary judgment to Camp Highland, the trial court acknowledged that "a breach of care occurred to some degree" and that Camp Highland's actions were "arguably negligent." However, the trial court found that this negligence did not rise to the level of gross negligence, reasoning that "this lapse occurred for only a very brief but chaotic period of time during a heavy rainstorm." Certainly, a reasonable person might view these events in this light and conclude that Camp Highland's actions, or inactions, during the evacuation did not constitute gross negligence. However, it is equally possible that a reasonable person might look at these same facts and conclude that the very existence of these circumstances should have alerted even the least diligent person of the need to ensure that Camp policies were followed during weather related evacuations and that no one was left unattended on the Course. At least one witness who had several years experience at the Camp testified that it was the worst rainstorm she had seen while on the Course, and several

witnesses, including Blocker, surmised that this may have contributed to miscommunication and the failure to ensure Bailey was off the Course. Further, while Blocker testified that she "typically" looks at the Course to make sure it is clear, there is no evidence that Blocker, or any of the other facilitators, did in fact perform such a visual inspection on the day that Bailey was injured. Under these circumstances – a rainstorm so intense that both vision and communication may have been impeded – reasonable persons might find that relying on only an informal plan for some unspecified Camp worker to perform a visual check of the Course to ensure participants were safely off the Course amounted to a failure to exercise even the slightest diligence or degree of care, thus rising to the level of gross negligence. In other words, reasonable persons might or might not consider it grossly negligent to have no formal plan in place to ensure that, during an evacuation, participants were not left unattended to exit the Course on their own and no formal plan in place to ensure that participants made it safely off the Course before the facilitators left the egress areas unattended. Accordingly, the trial court's order is reversed to the extent

that summary judgment was granted to Camp Highland on Bailey's claim for gross negligence.[9]

3. We reach a different result on Bailey's claim for punitive damages and attorney fees.

Georgia law is clear that punitive damages are authorized in tort cases only when "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b). "[N]egligence, even gross negligence, is inadequate to support a punitive damage award." *Poverty Destroyed Forever v. Vision Financial Svcs.*, 360 Ga. App. 691, 693 (2) (859 SE2d 612) (2021). Here, however, other than pointing to instances of what she claims are gross negligence, Bailey has made no meaningful argument as to her entitlement to punitive damages or pointed

---

[9] It follows that summary judgment is also reversed on Bailey's husband's derivative claim for loss of consortium. We note that other issues, such as whether Bailey should have kept shouting for help instead of attempting to descend the net on her own, should also be decided by a jury. Further, it will be for a jury to resolve any conflicts in the evidence based on deposition testimony that Bailey told a Camp employee that she fell because she lost her balance while reaching out for her student partner who had slipped.

to any such supporting evidence. Bailey has made even less of an argument to show why summary judgment should not have been granted on her claim for attorney fees under OCGA § 13-6-11.[10] Notably, she has not set out the requirements of that code section or specified the exact basis under the code section for her claim and has not made any real attempt to show her entitlement to such fees. Accordingly, we affirm the grant of summary judgment to Camp Highland on Bailey's claim for punitive damages and attorney fees under OCGA § 13-6-11.

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Gobeil, J., concur.*

---

[10] That section provides as follows: "The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."