## S13G0553. JOHNSON v. OMONDI.
### (751 SE2d 288)

HINES, Presiding Justice.

This Court granted a writ of certiorari to the Court of Appeals in *Johnson v. Omondi*, 318 Ga. App. 787 (736 SE2d 129) (2012), to determine whether the Court of Appeals properly applied the standards for a medical malpractice claim in a hospital emergency department as found in OCGA § 51-1-29.5 (c). Finding that the plurality opinion of the Court of Appeals erred, we reverse.

As set forth in the plurality opinion of the Court of Appeals, and as revealed in the record, Thelma Johnson took her 15-year-old son Shaquille to the emergency department at Phoebe Putney Memorial Hospital on December 29, 2007; a week earlier, Shaquille had undergone arthroscopic knee surgery. Shaquille complained of chest pain; was first seen by a nurse; and then examined by Dr. Price Paul Omondi. Dr. Omondi ordered that Shaquille be administered pain medication, an electrocardiogram ("EKG"), and a chest x-ray; he interpreted the results of the EKG and x-ray himself. Dr. Omondi noted that Shaquille had undergone arthroscopic knee surgery a week earlier; he inquired about Shaquille's medical history and family history and conducted a physical examination. Dr. Omondi ruled out asthma, pericarditis, myocardial infarction, pneumothorax, and, specifically, pulmonary embolism[1] as causes of Shaquille's pain. Dr. Omondi diagnosed Shaquille with pleurisy and discharged him from the hospital with a prescription for an anti-inflammatory pain reliever, and instructions to return to the emergency department if his symptoms continued. Two weeks later, Shaquille did return to the emergency department, but died of a bilateral pulmonary embolism. Further facts can be found in the opinion of the Court of Appeals.

Thelma Johnson and her husband ("the Johnsons") sued Dr. Omondi and Southwest Emergency Physicians, P.C., Dr. Omondi's employer (collectively, "Dr. Omondi"), for medical malpractice. Dr. Omondi moved for summary judgment, which the trial court granted. On appeal to the Court of Appeals, in a plurality opinion, that Court

---

[1] There was testimony that Shaquille's recent surgery increased the possibility of pulmonary embolism occurring.

looked to OCGA § 51-1-29.5 (c), held that there was no genuine issue of material fact to dispute Dr. Omondi's argument that he could not be liable under that statute, and affirmed the trial court.

It is certainly true that OCGA § 51-1-29.5 (c) controls this case. That subsection of the Code sets forth:

> In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (a) (9) defines "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care, which departure from standards proximately results in injury to or death of a claimant.

And, there is no dispute that Dr. Omondi was acting as a physician, providing emergency medical care, in a hospital emergency department, as contemplated by OCGA § 51-1-29.5 (c). Thus, this is one of those cases in which the General Assembly has placed a higher evidentiary burden on plaintiffs such as the Johnsons, namely, that any departure from accepted standards of medical care must be shown, by clear and convincing evidence, to be gross negligence.

As noted, the trial court granted Dr. Omondi summary judgment.

> A party is entitled to summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. [Cit.] The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact. [Cit.]

*Ansley v. Raczka-Long*, 293 Ga. 138, 140 (2) (744 SE2d 55) (2013). Our review of the grant or denial of a motion for summary judgment is de novo. *Woodcraft by MacDonald, Inc. v. Georgia Casualty and Surety Co.*, 293 Ga. 9, 10 (743 SE2d 373) (2013).

In an ordinary medical malpractice action, some evidence that Dr. Omondi violated the standard of care would generally serve to defeat his motion for summary judgment on that issue. See, e.g., *Aleman v. Sugarloaf Dialysis, LLC*, 312 Ga. App. 658, 660 (1) (719 SE2d 551) (2011); *Lee v. Phoebe Putney Mem. Hosp.*, 297 Ga. App. 692, 694 (2) (678 SE2d 340) (2009). However, under the heightened evidentiary burden in this case, Dr. Omondi cannot "be held liable unless it is proven by clear and convincing evidence that [his] actions showed gross negligence." OCGA § 51-1-29.5 (c). And, " '[c]lear and convincing' is a more stringent standard than 'preponderating' and requires a greater quantum and a high quality of proof in plaintiff's favor." *In re Estate of Burton*, 265 Ga. 122, 123 (453 SE2d 16) (1995) (Citations and punctuation omitted). But, OCGA § 51-1-29.5 (c)'s requirement that gross negligence must be proved by clear and convincing evidence does not necessarily mean that those issues must be presented to a finder of fact and that summary judgment is never appropriate. Although it is generally true that whether evidence meets the required standard of being "clear and convincing" is a question left to the finder of fact, in certain cases it is properly one for the trial court's determination. Id. at 123-124.

In regard to the trial court's role in evaluating a motion for summary judgment when a heightened evidentiary burden such as "clear and convincing" has been imposed, we find instructive the opinion of the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242 (106 SCt 2505, 91 LE2d 202) (1986).

> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what

boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. [Cit.]

Id. at 254-255 (II) (B). And, the heightened evidentiary burden imposed in cases falling under OCGA § 51-1-29.5 (c) must necessarily be considered on a motion for summary judgment. When faced with such a heightened burden, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. . . ." Id. at 254. "The appropriate summary judgment question is 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown [the required element] by clear and convincing evidence or that the plaintiff has not.' " *Howard v. Pope*, 282 Ga. App. 137, 141 (1) (637 SE2d 854) (2006) (citing *Anderson*, supra).

At trial, the conduct that the Johnsons would bear the responsibility to show by clear and convincing evidence was that Dr. Omondi's treatment of Shaquille constituted gross negligence under OCGA § 51-1-29.5 (c). Although many terms used in OCGA § 51-1-29.5 are defined therein, that Code section does not contain a definition of "gross negligence." However, this Court has previously recognized that, as "gross negligence" is not specifically defined in OCGA § 51-1-29.5, the term carries the general meaning set forth in OCGA § 51-1-4. *Gliemmo v. Cousineau*, 287 Ga. 7 (694 SE2d 75) (2010) (addressing a constitutional challenge to OCGA § 51-1-29.5 (c)). Thus, as used in OCGA § 51-1-29.5,

gross negligence is the absence of even slight diligence, and slight diligence is defined in [OCGA § 51-1-4] as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." In other words, gross negligence has been defined as "equivalent to (the) failure to exercise even a slight degree

of care" ([cits.]), or "lack of the diligence that even careless men are accustomed to exercise." [Cit.]

*Gliemmo*, supra at 12-13 (4).[2] While questions of gross negligence and slight diligence are usually to be determined by a factfinder, courts may resolve them as matters of law in plain and indisputable cases. *Mixon v. City of Warner Robins*, 264 Ga. 385, 389-391 (2) (444 SE2d 761) (1994); *Wolfe v. Carter*, 314 Ga. App. 854, 859 (2) (b) (726 SE2d 122) (2012). Accordingly, on his motion for summary judgment, Dr. Omondi was required to show that there was no genuine issue of material fact, and that a reasonable jury would be unable to find, by clear and convincing evidence, that he was grossly negligent. This he cannot do.

Dr. Omondi's own testimony was that he recognized the potential for pulmonary embolism and that it was part of his differential diagnosis, but that he ruled it out because: Shaquille was not of an age in which that condition was common; his vital signs were normal, including his pulse oximetry which was "perfect"; and he did not have shortness of breath. Dr. Omondi also testified that he diagnosed pleurisy because, when he ordered that Shaquille be given an injection of the pain medication Toradol, Shaquille responded favorably and his "pain went away," and that "if he's got something other than pleurisy going on and you give him Toradol, he wouldn't respond to it." He further testified that if Shaquille "had [pulmonary embolism] a shot of Toradol would not have taken away his symptoms."

The Johnsons submitted expert testimony that Dr. Omondi's actions did not meet the standard of care "in the medical profession generally under like and similar circumstances," and that he did not take action that would be appropriate to exclude pulmonary embolism from his diagnosis of Shaquille's condition and treatment thereof. And, expert testimony specifically noted that the symptoms Shaquille presented were "classical" indications of pulmonary embolism and that the diagnostic measures that Dr. Omondi took in response to those symptoms "did nothing to prove or disprove the presence" of pulmonary embolism. Rather, Shaquille's response to the administration of Toradol was termed "totally irrelevant" to investigating

---

[2] The dissent in the Court of Appeals takes issue with what it terms the plurality's "suggestion that immunity applies as long as some care is provided. . . ." *Johnson*, supra at 799 (Miller, P. J., dissenting). Of course, the requirement to exercise a "slight degree of care" does not mean that Dr. Omondi was required to provide merely "some medical care" so as to avoid liability under OCGA § 51-1-29.5 (c). Rather, exercising "a slight degree of care" and acting with "slight diligence" means exercising "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." *Gliemmo*, supra.

whether he had pulmonary embolism, and Dr. Omondi's reliance on it to exclude pulmonary embolism was termed "ridiculous." There was expert testimony that, in order to exclude pulmonary embolism from his diagnosis, the standard of care required Dr. Omondi to administer a CT scan, or a lung scan, which he did not do.

Given this evidence, a reasonable jury could find, by clear and convincing evidence, that in addressing Shaquille's symptoms, Dr. Omondi acted with gross negligence, i.e., that he lacked "the diligence that even careless men are accustomed to exercise." *Gliemmo*, supra; *Howard*, supra. Thus, this case is unlike *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008), in which summary judgment in favor of the emergency room physician was appropriate. In *Pottinger*, the physician ordered the diagnostic measure appropriate to the symptoms the patient presented, i.e., an x-ray, and then relied upon the services of another professional's evaluation of the x-ray when determining the course of treatment. Under those circumstances, a reasonable jury would not be able to find that the physician "failed to exercise even slight care and was therefore grossly negligent." Id. at 629.

It was error for the trial court to grant Dr. Omondi's motion for summary judgment, and the judgment of the Court of Appeals affirming that decision must be reversed.

*Judgment reversed. All the Justices concur.*

BLACKWELL, Justice, concurring.

I concur fully in the opinion of the Court. I write separately, however, to more fully explain my understanding of "gross negligence," as that standard is applied in medical malpractice cases. I also write separately to share some additional thoughts about summary judgments in cases in which OCGA § 51-1-29.5 applies.

1. "Gross negligence" is a familiar standard in our law, see *Peavy v. Peavy*, 36 Ga. App. 202, 204 (2) (136 SE 96) (1926), but it is one that has proven difficult to define with precision. According to our Code, "gross negligence" is "[t]he absence of [slight diligence]," and "slight diligence" is "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." OCGA § 51-1-4. From time to time, our Court of Appeals has offered other definitions of the standard, defining "gross negligence" as "the want of slight care and diligence, such care as careless and inattentive persons would usually exercise under the circumstances," *Peavy*, 36 Ga. App. at 204-205 (2) (citation and punctuation omitted), or "[the] lack of the diligence that even careless men are accustomed to exercise," *Levine v. Keene*, 178 Ga. App. 832, 832 (344 SE2d 684) (1986) (citations omitted), or "the want of even

scant care." *Tidwell v. Tidwell*, 92 Ga. App. 54, 57 (4) (87 SE2d 657) (1955). Our pattern jury charges define "gross negligence" in the same way as the Code. See Suggested Pattern Jury Instructions, Vol. I: Civil Cases § 60.030 (5th ed. 2013) ("In general, slight diligence or care is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances. . . . The absence of slight care is termed gross negligence."). And as it is used in OCGA § 51-1-29.5 with reference to malpractice in emergency medicine, we have defined "gross negligence" in similar terms, drawing upon both the Code and the case law:

> [G]ross negligence is the absence of even slight diligence, and slight diligence is defined . . . as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence has been defined as equivalent to the failure to exercise even a slight degree of care or lack of the diligence that even careless men are accustomed to exercise.

*Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010) (citations and punctuation omitted). The Court today uses the same definitions of "gross negligence."

The problem with these definitions is not that they are wrong, but that they were written for a very different context and time. Gross negligence appears to have found its way into our law in the Nineteenth Century as the measure of the fault by which a gratuitous bailee was liable for the loss of a bailment, see *Merchants Nat. Bank v. Guilmartin*, 88 Ga. 797, 799 (15 SE 831) (1892), and later, the standard was employed as the measure of the fault by which a gratuitous driver was liable for injury to his passenger. See *Hopkins v. Sipe*, 58 Ga. App. 511, 512 (3) (199 SE 246) (1938). It was in these sorts of cases — cases involving the loss of personal property or a personal injury in an automobile accident — that the definitions developed upon which the Court today relies. And in such cases, these definitions appear to have worked well enough. That they worked well enough in such cases is not surprising, insofar as such cases involve conduct and circumstances that are familiar to most ordinary citizens. Looking after personal property and driving an automobile do not require years of professional training or specialized education. Most ordinary citizens do such things as a part of their daily routines. And most ordinary citizens have some experience with "careless" or "inattentive" people, and they have at least some understanding of how such people tend to exercise a "slight degree of care" to look after

their own personal property and operate motor vehicles. The application of the gross negligence standard in cases involving such routine and mundane things is not an especially difficult task for judges, lawyers, and lay jurors.

But medical malpractice cases are different. The practice of medicine requires years of professional training and specialized education, and most ordinary citizens do not practice medicine — or even observe its practice — as a part of their daily routines. Judges, lawyers, and jurors usually need help to assess the fault of a physician. See *Summerour v. Lee*, 104 Ga. App. 73, 75 (2) (121 SE2d 80) (1961) ("It is the general rule in this jurisdiction that laymen, even jurors and courts, are not permitted to say what is proper medical and surgical treatment, for that is a medical question."). As our Court of Appeals has explained, "a jury cannot reasonably be expected to apply negligence principles to medical conduct absent competent evidence of what degree of skill and care the medical profession generally would have exercised under similar circumstances." *Wagner v. Timms*, 158 Ga. App. 538, 539 (1) (281 SE2d 295) (1981). See also *Pilgrim v. Landham*, 63 Ga. App. 451, 454-455 (11 SE2d 420) (1940) ("What is the proper method of diagnosing a case is a medical question to be testified to by physicians as expert witnesses. Laymen, even jurors and courts, are not permitted to say what is the proper method of diagnosing a case for discovering the nature of an ailment.").

By its enactment of OCGA § 51-1-29.5, the General Assembly did not divorce the generally accepted standards of medical care from the cases to which the statute applies. Indeed, OCGA § 51-1-29.5 itself makes this point quite plainly, insofar as it applies only with respect to "health care liability claim[s]," OCGA § 51-1-29.5 (c), and it expressly defines a "health care liability claim" as "a cause of action against a health care provider or physician for treatment, lack of treatment, or *other claimed departure from accepted standards of medical care* . . . ."[3] OCGA § 51-1-29.5 (a) (9). But how helpful is expert evidence of the generally accepted standards of medical care in a case in which

---

[3] Several of the amici curiae in this case seek to divorce the generally accepted standards of emergency medical care from the emergency medical malpractice cases to which the statute applies. They urge, for instance, that expert medical testimony is wholly irrelevant, inasmuch as judges, lawyers, and lay jurors can assess for themselves whether a physician has exercised "slight care" or has done what a "man of common sense" would do. These arguments strike me as rather silly, especially in light of the plain language of OCGA § 51-1-29.5, which makes perfectly clear that the generally accepted standards of medical care still have a significant role to play in cases to which the statute applies. But our continuing reliance on archaic definitions of "gross negligence" that do not expressly account for accepted standards of medical care may invite such silliness.

"gross negligence" is defined as our Court defines it today? How does evidence of the "degree of skill and care the medical profession generally would have exercised under similar circumstances" help judges, lawyers, and jurors to understand what a "careless" and "inattentive" emergency physician, albeit an emergency physician with "common sense," would have done in the same circumstances as are presented in the case? For medical malpractice cases, we need another definition of "gross negligence," one that accounts for the generally accepted standards of medical care in the medical profession.

We find the beginnings of such a definition in the Georgia precedents. In a number of cases, our Court of Appeals has said that "gross negligence" is "carelessness manifestly materially greater than want of common prudence." See, e.g., *Rider v. Taylor*, 166 Ga. App. 474, 474 (1) (304 SE2d 557) (1983); *Williams v. Ross*, 120 Ga. App. 326, 328 (170 SE2d 442) (1969); *Meeks v. Johnson*, 112 Ga. App. 760, 765 (146 SE2d 121) (1965); *Perry v. Poss*, 86 Ga. App. 169, 175 (2) (71 SE2d 283) (1952); *Whitfield v. Wheeler*, 76 Ga. App. 857, 859 (1) (47 SE2d 658) (1948), overruled on other grounds in *Caskey v. Underwood*, 89 Ga. App. 418, 422-423 (4) (79 SE2d 558) (1953); *Peavy*, 36 Ga. App. at 205. In another case, our Court of Appeals has characterized "gross negligence" as "very great negligence." *Tidwell*, 92 Ga. App. at 57 (4). And in yet another case, our Court of Appeals has said that "[t]he culpability which characterizes all negligence is, in gross negligence, magnified to a high degree as compared with that present in ordinary negligence." *Hatcher v. Bray*, 88 Ga. App. 344, 345-346 (2) (77 SE2d 64) (1953) (punctuation omitted).

These precedents suggest a more helpful definition, one that focuses less on the care provided by the emergency physician as compared to no care at all, and one that focuses more on the degree of deviation from the applicable standard of care, a standard that necessarily must be supplied by evidence of the generally accepted practices of the medical profession in similar circumstances, just as the plain terms of OCGA § 51-1-29.5 contemplate. In the words of the precedents, "gross negligence" in the medical malpractice context means "carelessness manifestly materially greater than want of" the "degree of skill and care the medical profession generally would have exercised under similar circumstances." Put in plainer terms — just as the plaintiffs in this case put it —

> [l]iability is authorized under OCGA § 51-1-29.5 (c) where the evidence of record, including the admissible testimony of qualified experts, would permit a reasonable jury to find by

clear and convincing evidence that the defendant caused harm by grossly deviating from the applicable medical standard of care.[4]

As other jurisdictions have recognized, "[t]he medical standard of care is the same for ordinary negligence and gross negligence, the difference being the extent to which the physician breached the standard. . . . To be grossly negligent, the defendant must breach the ordinary standard of care to a greater degree."[5] *Nowzaradan v. Ryans*, 347 SW3d 734, 740 (II) (B) & n. 5 (Tex. App. 2011). See also *Tendai v. Mo. State Bd. of Registration for the Healing Arts*, 161 SW3d 358, 367-368 (Mo. 2005) (applying the plain and ordinary meaning of "gross negligence" to require a gross deviation from standard of care in professional licensing context), overruled on other grounds in *Albanna v. State Bd. of Registration for the Healing Arts*, 293 SW3d 423, 428, n. 2 (Mo. 2009); *Albright v. Abington Memorial Hosp.*, 696 A2d 1159, 1164 (Pa. 1997) ("The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." (citation omitted)); *Browne v. Robb*, 583 A2d 949, 953 (I) (B) (Del. 1990) (professional malpractice case defining "gross negligence" as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care' " (citation omitted)); *Decker v. City of Imperial Beach*, 257 Cal. Rptr. 356, 358 (III) (Cal. App. 1989) ("California courts require a showing of the want of even scant care or an extreme departure from the ordinary standard of conduct in order to establish gross negligence." (citations and punctuation omitted)); *Livingston v. Arkansas State Med. Bd.*, 701 SW2d 361, 363 (Ark.

---

[4] As amicus curiae, the Medical Association of Georgia argues that OCGA § 51-1-29.5 "imposes a 'gross negligence' standard, not a 'gross deviation from the standard of care' standard." That the statute sets up "gross negligence" as the standard of liability is true enough. But the question is whether "gross negligence" in this context means something other than a "gross deviation from the standard of care." As I have noted several times, the statute contemplates that it will apply only in certain cases in which a physician or other medical provider is alleged to have deviated from the generally accepted standards of medical care. So, those generally accepted standards must be a part of the proof of "gross negligence." And as evidenced by the precedents that I have cited, our courts have traditionally defined "gross negligence" in terms of, among other things, a substantial, gross, or "manifestly materially greater" deviation from the standard of care. The definition of "gross negligence" urged by the plaintiffs is the one that reconciles the traditional understandings of "gross negligence" with the statutory command that the accepted standards of medical care still count for something in the emergency room.

[5] Long before the enactment of OCGA § 51-1-29.5, Georgia law accounted to some extent for the emergency circumstances in which an emergency physician might find himself by limiting the medical standard of care to that standard generally accepted in the medical profession in the same or similar circumstances. See Bennett, Ga. Medical Torts — Physicians § 3-8, p. 37 (1981).

1986) (looking to California definition in professional licensing context); *Storrs v. Lutheran Hospitals & Homes Soc. of America*, 661 P2d 632, 634 (Alaska 1983) ("gross negligence" requires a "major departure from the standard of care").

No one should understand this concurring opinion to suggest that "gross negligence" means something different in OCGA § 51-1-29.5 than elsewhere in the Code and case law. To the contrary, this opinion only suggests that we articulate the "gross negligence" standard in a different way in medical malpractice cases, so as to focus more explicitly upon the accepted standards of medical care against which "gross negligence" must be measured in such cases. Such an articulation would be more helpful to judges, lawyers, and jurors than the articulation that the Court offers today. But with the understanding that the opinion of the Court is perfectly consistent with such an articulation — the Court does not say so expressly, but it looks in its opinion to the accepted standard of medical care in the circumstances in which Dr. Omondi found himself, and it finds some evidence in the record of a substantial and gross deviation from that standard by Dr. Omondi — I am content to join that opinion.

2. About summary judgment, Dr. Omondi and several of the amici curiae worry in their briefs that, if summary judgment is not warranted in this case, it will be no more available in cases in which OCGA § 51-1-29.5 applies than in ordinary medical malpractice cases. And if that is so, they say, the legislative purpose of OCGA § 51-1-29.5 will have been frustrated. But the change worked by the enactment of OCGA § 51-1-29.5 is a real one. It always will be harder to prove "gross negligence" than "ordinary negligence," and it always will be harder to prove fault by clear and convincing evidence than by a mere preponderance of the evidence. For that reason, there will be some cases to which the statute applies in which summary judgment is warranted, notwithstanding that a plaintiff in an ordinary malpractice case might survive summary judgment on the same record. See, e.g., *Pottinger v. Smith*, 293 Ga. App. 626, 629 (667 SE2d 659) (2008). Nevertheless, it may be true that summary judgment will not be awarded in cases in which OCGA § 51-1-29.5 applies with substantially more frequency than in ordinary malpractice cases.

That, however, is as much a consequence of the standard for summary judgment as anything else. Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). When a court considers a motion for summary judgment, it must view the pleadings and evidence in the light most favorable to the

nonmoving party, it must accept the credibility of the evidence upon which the nonmoving party relies, it must afford that evidence as much weight as it reasonably can bear, and to the extent that the moving party points to conflicting evidence, it must discredit that evidence for purposes of the motion. Thus, if a defendant in a case like this one moves for summary judgment and points to the favorable testimony of a dozen winners of the Nobel Prize for Medicine (all of whom say that he did not deviate at all from the accepted standard of medical care), but the plaintiff responds with the admissible testimony of a barely qualified medical expert (who shows that the defendant substantially and grossly deviated from the accepted standard of medical care), the trial court must assume — as unlikely as it may be — that the jury will believe the plaintiff's expert and disbelieve the expert array offered by the defendant. For purposes of the motion for summary judgment, the trial court would consider the testimony of the plaintiff's expert, but not the conflicting testimony of the Nobel Prize winners.

Viewing the record in this way is required by OCGA § 9-11-56 (c), and nothing in OCGA § 51-1-29.5 purports to modify the usual standard for summary judgment. More important, even if the General Assembly sought to make summary judgments more common in emergency malpractice cases, its power to do so is limited. After all, viewing the record as we must on motions for summary judgment is required not only by OCGA § 9-11-56 (c), but also in large part by the Constitution, which commits the adjudication of genuine disputes of material fact to the jury, and which safeguards the constitutional prerogatives of the jury against legislative and judicial encroachments alike. See Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a) ("The right to trial by jury shall remain inviolate. . . ."). See also *Atlanta Oculoplastic Surgery v. Nestlehutt*, 286 Ga. 731, 733 (2) (691 SE2d 218) (2010); *Tilley v. Cox*, 119 Ga. 867, 871 (47 SE 219) (1904) ("[I]t is the province of the jury, in civil cases, to pass upon questions of fact, and a trial by jury in such cases presupposes an issue of fact; so if there be no such issue, there is nothing for a jury to pass on."). We need not decide in this case, however, whether OCGA § 9-11-56 (c) marks the outermost boundaries of the extent to which cases may be decided by summary judgments, inasmuch as OCGA § 51-1-29.5 says nothing about summary judgment and does nothing to change the usual standard for summary judgment.

That OCGA § 51-1-29.5 may not produce many more summary judgments, however, does not mean that it is insignificant. The statute essentially tells a jury to put one thumb on the scale for the defendant as to "gross negligence," and to put the other thumb as well on the scale for the defendant as to "clear and convincing" proof.

Unlike at summary judgment, these thumbs on the scale may produce far more defense verdicts at trial than in ordinary malpractice cases. In criminal cases, after all, the prosecution must prove guilt beyond a reasonable doubt, a burden even heavier than the burden to prove fault by clear and convincing evidence. Yet, we do not see criminal cases routinely decided by directed verdicts of acquittal. Most criminal cases go to the jury, but juries — when charged with their obligation to acquit unless the evidence proves the guilt of the defendant beyond a reasonable doubt — render defense verdicts in no small number of cases. No one should be surprised if medical malpractice cases under OCGA § 51-1-29.5 turn out in much the same way.

I am authorized to state that Justice Nahmias joins this opinion.

DECIDED NOVEMBER 14, 2013.

*Edmond & Lindsay, Roderick E. Edmond, Keith L. Lindsay, Summerville Moore, James D. Summerville, Sidney L. Moore III,* for appellants.

*Huff, Powell & Bailey, Randolph P. Powell, Jr., Jeffrey D. Braintwain, Michael G. Frankson,* for appellees.

*Allen, McCain & O'Mahony, Hunter S. Allen, Jr., Simuel F. Doster, Jr., Green & Sapp, Henry D. Green, Jr., Alston & Bird, Theodore B. Eichelberger, Bernard Taylor, Joshua L. Becker, Weathington Smith, Paul E. Weathington, Paul I. Hotchkiss, Owen, Gleaton, Egan, Jones & Sweeney, Gretchen H. Wagner, Derrick L. Bingham, David V. Hayes,* amici curiae.