**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 30, 2025**

# In the Court of Appeals of Georgia

A25A0765. SMITH et al. v. GADEGBEKU et al.

DILLARD, Presiding Judge.

Robert J. Smith and Henry J. Smith—as surviving sons of Barbara Smith and personal representatives of her estate[1]—filed a medical-malpractice action against Phillipe Gadegbeku, M.D., Nabil Muhanna, M.D., and their respective employers.[2] In doing so, the Plaintiffs alleged the Defendants failed to provide Barbara with proper medical treatment while she was in the emergency department of Northeast Georgia

---

[1] We refer to Robert J. Smith and Henry J. Smith as the "Plaintiffs." When necessary for the sake of clarity and brevity, we refer to the Smiths by their first names.

[2] We refer to Phillipe Gadegbeku, M.D., Nabil Muhanna, M.D., and their respective employers as the "Defendants."

Medical Center[3] and that this resulted in her suffering irreversible paraplegia and passing away several months later. After trial, a jury found for the Defendants, which the trial court affirmed in its judgment. On appeal, the Plaintiffs contend the trial court erred by (1) concluding the definition of "gross negligence" in OCGA § 51-1-4 also defines that term in the context of the Emergency Room Statute (OCGA § 51-1-29.5, *i.e.*, "the ER Statute"); (2) providing the pattern instruction on gross negligence; (3) instructing the jury to focus on the entirety of the Defendants' treatment of Barbara rather than whether specific acts or omissions violated the standard of care; and (4) providing conflicting and confusing instructions on slight care and gross negligence. For the following reasons, we affirm.

Construed in favor of the jury's verdict,[4] the record shows that in 2017, Barbara was 77 years old with a medical history that included an aortic aneurism, two artificial heart-valve replacements, and chronic back pain. On the morning of June 21, 2017, Barbara scheduled an appointment with her pain-management physician, Dr. Ammar

---

[3] We refer to the Northeast Georgia Medical Center as "NEGMC.'

[4] *See Am. Infoage, LLC v. Only Sol. Software, LLC*, 362 Ga. App. 706, 707 (870 SE2d 47) (2022) ("Following a jury verdict, we view the evidence in the light most favorable to the prevailing party." (punctuation omitted)).

2

Divan, who administered an epidural injection in her lower back. After the appointment, Barbara walked without assistance and Henry's wife drove her to her sister's home for a visit. Later in the early afternoon, while still at her sister's house, Barbara said she did not feel well and went to sit on the sofa. But a moment later, Barbara told her sister that she could not move her legs. Barbara then called her health insurance's help-line and spoke with a representative, who—after hearing a description of her symptoms—advised her to immediately call for emergency assistance, which she did.

An ambulance transported Barbara to the NEGMC emergency department, where she arrived around 2:35 p.m. Once there, she reported to the triage nurse the following symptoms: severe back pain, chest pain, and paralysis in both legs—which she claimed started about two hours earlier. A few minutes later, Dr. Gadegbeku met with Barbara, took her medical history, and performed a physical examination. During that exam, Gadegbeku asked Barbara if she could move her legs, but she was unable to do so. He next used a needle to poke different places on her leg to see if she could feel anything. Barbara again stated that she could not, leading Gadegbeku to conclude

that she had no motor function in her legs and was unable to feel anything from her chest down.

In light of this examination, and despite being aware of the epidural injection that she received earlier that day, Dr. Gadegbeku's primary concern was Barbara's chest pain—as it could indicate an aortic dissection, which is often fatal if not treated quickly. As a result, Gadegbeku ordered a CT scan of Barbara's chest to be done as soon as possible, to be followed by an MRI on her back. The CT scan was completed around 4:40 p.m., and it allayed Gadegbeku's immediate concern by ruling out an active aortic dissection. The scan also showed a "shadow" in Barbara's back, but it did not do so with enough detail. So, Gadegbeku decided to go forward with the MRI as well. But before this could be conducted, Gadegbeku needed to first determine whether Barbara's heart valves were MRI-safe—information usually kept on a card by a patient who has undergone that procedure. Initially, Barbara's family could not locate her card, so Gadegbeku attempted to contact her physician (who would have this information). But after a significant delay, Barbara found the card, and it confirmed that her heart valves were MRI-safe. Even so, apparently due to errors by NEGMC's staff, the initial MRI was not performed until 8:20 p.m. And

4

unfortunately, because Barbara moved while the MRI was conducted, the image was not clear enough for surgical planning and had to be retaken.

When the retaken MRI result was reviewed, it indicated fluid accumulating next to Barbara's spine, which explained her paralysis and posed a significant danger. At this point, it was around 11:20 p.m., and Dr. Gadegbeku consulted Dr. Muhanna (a neurosurgeon) to inform him of the situation—particularly that Barbara appeared completely paralyzed from the chest down. Soon after, Muhanna arrived at the hospital and conducted a physical exam of Barbara, which confirmed that she had no ability to move her lower extremities and no sensation below her chest. And the retaken MRI showed swelling around the lower part of her spinal cord—irreversibly damaging it. Apparently, the epidural injection Barbara received that morning caused a hematoma in her thoracic spine, compressing her spinal cord and resulting in paralysis.

After his examination and review of the MRI images, Dr. Muhanna discussed the diagnosis with Barbara and explained that surgery posed various risks, including blood clots and complications from anesthesia. More importantly, he informed Barbara that—based on his experience—the likelihood of surgery improving her

situation was extremely low. Muhanna also explained the situation to Barbara's son Henry, after which Barbara asked for a few moments to think things over. But a short time later, Barbara's sons informed Muhanna that she and the family had decided to forgo the surgery. Barbara was eventually discharged from NEGMC and remained paralyzed for the remaining nine months of her life. She passed away on March 12, 2018.

On April 17, 2019, Barbara's sons filed a medical malpractice action against Dr. Gadegbeku, Dr. Muhanna, the doctors' respective employers, and NEGMC, alleging the Defendants failed to provide their mother with proper medical treatment while she was in NEGMC's emergency department. More precisely, Plaintiffs alleged the Defendants' delay in diagnosing the cause of Barbara's symptoms (the spinal hematoma) amounted to gross negligence, which in turn resulted in her suffering irreversible paraplegia and passing away several months later. Each of the Defendants filed answers, and discovery ensued. Before the end of the discovery period, NEGMC settled and was dismissed from the case.

In June 2024, the case proceeded to trial, and the parties presented the foregoing evidence. During the charge conference, the Plaintiffs objected to the use

of the pattern instruction defining gross negligence and slight diligence, arguing that it was "confusing and misleading"—and also inaccurate based on current case authority. But after a great deal of discussion, the trial court decided it would provide the pattern instruction on gross negligence, as well as an instruction applying that definition to the context of a medical-malpractice action under OCGA § 51-1-29.5.

After the parties rested and made their respective closing arguments, the trial court instructed the jury as discussed during the charge conference, and the Plaintiffs reiterated their objections. Later, the jury rendered a verdict in favor of the Defendants. The trial court then issued its judgment affirming the jury's verdict. A few days later, the court amended its judgment but solely to note that the parties would bear their own trial costs. This appeal follows.

1. The Plaintiffs argue the trial court erred by concluding the definition of gross negligence in OCGA § 51-1-4 also defines that term in the context of the ER Statute (*i.e.*, OCGA § 51-1-29.5). We disagree.

This enumeration of error requires us to consider the interpretive interplay between OCGA § 51-1-29.5 and OCGA § 51-1-4. So, tasked with interpreting this statutory language, we necessarily begin our analysis with "familiar and binding

canons of construction."[5] And in considering any statute's meaning, our charge as an appellate court is to "presume that the [legislature] meant what it said and said what it meant."[6] Toward that end, we must afford the statutory text its plain and ordinary meaning,[7] consider the text contextually,[8] read the text "in its most natural and

---

[5] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord Flanders v. Jackson*, 344 Ga. App. 493, 495 (1) (810 SE2d 656) (2018); *In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[6] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted); *accord Flanders*, 344 Ga. App. at 495 (1); *Holcomb*, 329 Ga. App. at 517 (1); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

[7] *Deal*, 294 Ga. at 172 (1) (a); *accord Flanders*, 344 Ga. App. at 495-96 (1); *Holcomb*, 329 Ga. App. at 517 (1); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text." (punctuation and citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original . . . or plain meaning of the text at issue (and all that the text fairly implies). . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning. . . ." (punctuation omitted)); *see also* Amy Coney Barrett, *Listening to the Law: Reflections on the Court and Constitution* 29 (Sentinel 1st ed. 2025) (explaining that judges are "referees, not kings, because they decide whether people have played by the rules rather than what the rules should be.").

[8] *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it

8

reasonable way, as an ordinary speaker of the English language would,"[9] and seek to "avoid a construction that makes some language mere surplusage."[10] In sum, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[11]

Turning to the statutes at issue, OCGA § 51-1-29.5 (c) provides:

In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is

---

appears[.]"); *see also Tibbles*, 297 Ga. at 558 (1) ("The common and customary usages of the words are important, but so is their context." (punctuation and citation omitted)); *Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (II) (C) (2) (7th Cir. 2013) (Manion, J.) (noting that in statutory construction cases, courts "begin with the language of the statute itself and the specific context in which that language is used." (punctuation and citation omitted)).

[9] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb*, 329 Ga. App. at 518 (1).

[10] *In the Interest of L.T.*, 325 Ga. App. at 592 (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1).

[11] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

Although the term "gross negligence" is not defined in OCGA § 51-1-29.5, subsection (b) of the statute offers helpful guidance, noting that "[a]ny legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law." In light of this directive, searching the common law for the meaning of "gross negligence" is unnecessary as that term *is* defined in the same chapter—specifically by OCGA § 51-1-4, which provides:

> In general, slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. As applied to the preservation of property, the term "slight diligence" means that care which every man of common sense, however inattentive he may be, takes of his own property. The absence of such care is termed gross negligence.

Thus, the plain language of OCGA § 51-1-29.5 (b) and the presumption that a "statute was enacted by the legislature with full knowledge of the existing condition of the law and with reference to it[]"[12] belie the Plaintiffs' contention.

---

[12] *City of Atlanta v. City of College Park*, 292 Ga. 741, 744 (741 SE2d 147) (2013); *accord Arc Gaming & Techs., LLC v. Hiram Imp, Inc.*, 375 Ga. App. 581, 584 (916 SE2d 781) (2025).

Our caselaw also undermines the Plaintiffs' argument. Indeed, the Supreme Court of Georgia explicitly rejected a claim that OCGA § 51-1-29.5 (c) was unconstitutionally vague because it did not define "gross negligence."[13] In doing so, the *Gliemmo* Court cited to OCGA § 51-1-4 in explaining that "gross negligence has been defined as equivalent to the failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise."[14] Then, a few years later, in *Johnson v. Omondi*,[15] our Supreme Court reiterated that conclusion, holding it "previously recognized that, as 'gross negligence' is not specifically defined in OCGA § 51-1-29.5, the term carries the general meaning set forth in OCGA § 51-1-4."[16] The *Omondi* Court continued by explaining that "as used in OCGA § 51-1-29.5, gross negligence is the absence of even slight diligence, and slight diligence is defined

---

[13] *See Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010) (punctuation omitted); *accord Pottinger v. Smith*, 293 Ga. App. 626, 628 (667 SE2d 659) (2008).

[14] 287 Ga. at 12-13 (punctuation omitted); *accord Pottinger*, 293 Ga. App. at 628.

[15] 294 Ga. 74(751 SE2d 288) (2013).

[16] *Id.* at 77.

in OCGA § 51-1-4 as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances."[17]

In *Omondi*, Justice Blackwell—while fully concurring with the result and the majority's definition of gross negligence—wrote separately to explain that OCGA § 51-1-29.5, by its own terms, "did not divorce the generally accepted standards of medical care from the cases to which the statute applies."[18] And in doing so, Justice Blackwell advocated for another definition of gross negligence—one that accounts for the standard of medical care, as the common definition saddles the jury with the difficult task of understanding not only the "degree of skill and care the medical profession generally would have exercised under similar circumstances" but also what a "'careless' and 'inattentive' emergency physician" would have done in similar circumstances.[19] Put another way, Justice Blackwell proposed that "gross negligence" in the medical-malpractice context be defined as "carelessness manifestly materially greater than want of the degree of skill and care the medical profession generally

---

[17] *Id.* at 77-78 (punctuation omitted).

[18] *Id.* at 81 (1) (Blackwell, J., concurring)

[19] *Id.* at 81-82 (1).

would have exercised under similar circumstances."[20] But significantly, Justice Blackwell—in no uncertain terms—warned "[n]o one should understand [this] concurring opinion to suggest that 'gross negligence' means something different in OCGA § 51-1-29.5 than elsewhere in the Code and case law."[21]

Nearly four months later, in *Abdel-Samed v. Dailey*,[22] the Supreme Court of Georgia again held that "'[g]ross negligence' is defined as the absence of even slight diligence, and slight diligence is defined in OCGA § 51-1-4 as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances."[23] And citing to Justice Blackwell's concurrence in *Omondi*, the *Abdel-Samed* Court added that in

> [a]pplying this definition in the context of a medical malpractice action brought pursuant to OCGA § 51–1–29.5 (c), liability would be authorized where the evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the defendants

---

[20] *Id.* at 82 (1) (punctuation omitted).

[21] *Id.* at 84 (1).

[22] 294 Ga. 758 (755 SE2d 805) (2014).

[23] *Id.* at 765 (3) (punctuation omitted).

caused harm by grossly deviating from the applicable medical standard of care.[24]

As a result, although the Supreme Court of Georgia has supplemented the definition of gross negligence in the medical-malpractice context, the Plaintiffs' contention that OCGA § 51-1-4 does not define "gross negligence" in the ER Statute is explicitly refuted by decisions of that Court, which we are bound to follow.[25]

The trial court did not err, then, in concluding the definition of gross negligence in OCGA § 51-1-4 also defines that term in the context of OCGA § 51-1-29.5.

---

[24] *Id.* (punctuation omitted), *citing Johnson*, 294 Ga. at 82-83 (1) (Blackwell, J., concurring).

[25] *See* GA. CONST., Art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court [of Georgia] shall bind all other courts as precedents."); *Whorton v. State*, 321 Ga. App. 335, 339 (1) (741 SE2d 653) (2013) (holding that "vertical *stare decisis* dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia"); *State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010) ("Stare decisis is an important principle that promotes the rule of law . . . ."); *see also* Kurt T. Lash, *Originalism, Popular Sovereignty, and Reverse Stare Decisis*, 93 Va. L. Rev. 1437, 1454 (2007) (noting that "[v]ertical stare decisis refers to the binding effect of precedent on lower courts," and that "[s]erious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal").

2. Plaintiffs also maintain the trial court erred by providing the jury with the pattern instruction on gross negligence, claiming that it misstates the current law. Again, we disagree.

We review *de novo* an allegedly erroneous jury instruction, which is "a legal question."[26] And in assessing the assertion of an erroneous jury instruction, the instruction "must be evaluated in the context of the trial court's jury instructions as a whole."[27] Indeed, the only requirement regarding jury charges is that they were, as given, "correct statements of the law and, as a whole, would not mislead a jury of

---

[26] *Wright v. State*, 365 Ga. App. 288, 289 (1) (878 SE2d 137) (2022) (punctuation omitted); *accord Johnson v. State*, 323 Ga. App. 65, 68 (2) (744 SE2d 921) (2013); *see Walker v. State*, 311 Ga. 719, 722 (2) (859 SE2d 25) (2021) ("Whether the evidence was sufficient to warrant the requested instruction is a legal question, which we review de novo." (punctuation omitted)).

[27] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *accord White v. Stanley*, 369 Ga. App. 330, 331-32 (893 SE2d 466) (2023); *see Walker*, 311 Ga. at 724 (3) ("When we are presented with a claim that a particular instruction is misleading, we do not evaluate jury charges in isolation, but rather consider them as a whole to determine whether there is a reasonable likelihood the jury improperly applied a challenged instruction." (punctuation omitted); *Fassnacht v. Moler*, 358 Ga. App. 463, 475 (1) (b) (855 SE2d 692) (2021) (explaining that jury charges and recharges must be read as a whole).

15

ordinary intelligence."[28] And significantly, an erroneous charge does not warrant a reversal "unless it was harmful and, in determining harm, the entirety of the jury instructions must be considered."[29] That said, we have held that "erroneous charges are presumed to be prejudicial and harmful, but this is not conclusive because the presumption of harm which arises from a charging error may be overcome by a review of the record as a whole."[30]

Here, during the charge conference, the Plaintiffs objected when the trial court stated that it intended to provide the suggested pattern instruction on the legal

---

[28] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *accord White*, 369 Ga. App. at 332; *see Sw. Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410, 419-20 (3) (819 SE2d 696) (2018) (noting that a jury charge "must be adjusted to the evidence, apt, and a correct statement of the applicable law" (punctuation omitted)).

[29] *Wright*, 365 Ga. App. at 289 (1) (punctuation omitted); *accord Williams v. State*, 267 Ga. 771, 773 (2) (a) (482 SE2d 288) (1997); *Mubarak v. State*, 305 Ga. App. 419, 421 (2) (699 SE2d 788) (2010).

[30] *Payne v. Thompson*, 234 Ga. App. 533, 533 (507 SE2d 257) (1998) (punctuation omitted); *see Foskey v. Foskey*, 257 Ga. 736, 737 (2) (363 SE2d 547) (1988) ("When an error in the charge of the court is shown to exist, it is presumed to be prejudicial and harmful, and this [C]ourt will so hold unless it appears from the entire record that the error is harmless." (punctuation omitted)); *Thomas v. Emory Clinic, Inc.*, 321 Ga. App. 457, 461 (1) (d) (739 SE2d 138) (2013) ("[E]rror is presumed hurtful unless it appears to have had no effect upon the result of the trial." (punctuation omitted)).

concept of gross negligence, which mirrors the language in OCGA § 51-1-4.[31] And despite their objection, the trial court echoed the pattern instruction and charged the jury on gross negligence as follows:

> Now, the case before you is a tort case in which the plaintiff must prove by clear and convincing evidence that the gross negligence of the defendants, if any, was a proximate cause of the injuries to Barbara Smith. In general, slight diligence or care is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances. The absence of slight care is termed gross negligence.

At the conclusion of the jury charges, the Plaintiffs objected again to this and related instructions.

On appeal, the Plaintiffs argue that—regardless of whether we find the claim in their first enumeration of error persuasive—the trial court's pattern instruction on gross negligence, standing alone, misstates the law as it applies in the context of the ER statute. But the demarcation line they posit is illusory. The incorrectness of the Plaintiffs' contention in Division 1, *supra*, is hardly irrelevant to their contention here,

---

[31] *See* SUGGESTED PATTERN JURY INSTRUCTIONS, Vol. I: Civil Cases § 60.030 (5th ed. 2013).

as they—at least implicitly—again challenge the applicability of OCGA § 51-1-4 to the ER Statute. And as we held in Division 1, the plain language of OCGA § 51-1-29.5 (b) and binding caselaw dictates that OCGA § 51-1-4 defines "gross negligence" in the ER Statute.[32] As a result, the trial court's inclusion of the pattern instruction on gross negligence is not a misstatement of the law.

In addition, contrary to the Plaintiffs' second assertion, the trial court's full instructions in no way divorced the concept of gross negligence or slight diligence from its application to OCGA § 51-1-29.5 (c). In fact, a few moments after providing the pattern instruction on gross negligence, the court also charged the jury as follows:

> In an action for medical negligence arising out of an emergency medical care in a hospital emergency department, no healthcare provider shall be held liable unless it is proven by clear and convincing evidence that the healthcare provider's care was grossly negligent.

---

[32] *See Abdel-Samed*, 294 Ga. at 765 (3) (explaining that gross negligence is defined by OCGA § 51-1-4 and that applying this definition to OCGA § 51-1-29.5 (c) means liability would be authorized when evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the defendants caused harm by grossly deviating from the applicable medical standard of care).

Then, after briefly reiterating the inverse relationship between slight diligence and gross negligence, the trial court also instructed that

> [i]n an action against a healthcare provider for malpractice it is presumed that the medical services or procedures were performed in an ordinary skillful manner and the burden is on the plaintiff to show that the healthcare provider grossly failed to treat the patient with ordinary skill, care, and diligence. Expert testimony is required to rebut the presumption, and the expert testimony must demonstrate a gross deviation from the recognized and accepted standard of care.

So, a review of the trial court's instructions in their entirety demonstrates that it harmonized the definition of gross negligence in OCGA § 51-1-4 and how that legal concept applies in a medical-malpractice action under OCGA § 51-1-29.5 (c).[33] And given these circumstances, the court did not err but accurately instructed the jury in this regard.[34]

---

[33] *See id.*

[34] *See Lewis v. Van Anda*, 282 Ga. 763, 767-68 (5) (653 SE2d 708) (2007) (holding that because trial court actually gave part of a jury charge that appellant claimed was improperly omitted and because remainder of court's charge adequately defined one of the legal terms at issue, the court's jury charge taken as a whole was not misleading and did not constitute reversible error); *Quinney*, 347 Ga. App. at 418-19 (2) (concluding in emergency department malpractice case that trial court's instruction providing if defendant physician failed to use at least slight diligence, defendant physician would be grossly negligent was "adjusted to the evidence, apt,

3. The Plaintiffs also claim the trial court erred by instructing the jury to focus on the entirety of the Defendants' treatment of Barbara rather than whether their specific acts or omissions related to her treatment grossly deviated from the standard of care. Yet again, we disagree.

After instructing the jury that gross negligence must be found by clear and convincing evidence, the trial court charged that"[i]f a healthcare provider in the emergency care and treatment of a patient exercised at least slight diligence in providing that care, then there could be no finding of gross negligence." The Plaintiffs argue this charge constituted error because it instructed the jury to focus on the entire emergency care and treatment that Dr. Gadegbeku and Dr. Muhanna provided to Barbara—essentially telling the jury that if the Defendants exercised slight diligence as to *any* aspect of Barbara's care, they could not be found liable. But again, a review of the trial court's instructions in their entirety refutes this claim.

Immediately after providing the pattern instruction on gross negligence, the trial court charged the jury as follows:

---

and a correct statement of the applicable law" (punctuation omitted)).

The plaintiffs must prove that the defendants were grossly negligent in one or more ways alleged in order to recover. It is not necessary for the plaintiff to prove that the defendants were grossly negligent in every way that the plaintiffs claim. If you find no gross negligence at all on the part of the defendants, then the plaintiffs' case against the defendants ends.

And soon after the jury began its deliberations, it sent a note to the trial court, asking: "Please clarify: Do we need to only find one action that is grossly negligent in order to find a verdict of gross negligence?" And while Plaintiffs' counsel initially suggested responding "yes," the parties quickly agreed that the best course of action was for the trial court to reread the charge. So, the trial court recharged the jury on this instruction.

Based on our review of the trial court's jury instructions as a whole, rather than isolating any one charge, the Plaintiffs' claim that the trial court effectively instructed the jury it could render a verdict in the Defendants' favor if they exercised slight diligence in *any* aspect of their treatment and care of Barbara lacks merit. But even if we assumed the court's "slight diligence in providing that care" charge was confusing, it *explicitly* instructed the jury *twice* that it was "not necessary for the plaintiff to prove that the defendants were grossly negligent in every way that the

plaintiffs claim." And it is well established that "the jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary."[35] Here, the Plaintiffs provide no evidence the jury ignored the trial court's instructions, much less clear evidence that it did so.

Within this same enumeration of error, the Plaintiffs also claim that, in charging the jury on "slight diligence," the trial court neglected to charge the jury that the "baseline standard of care" applied to the Defendants. But again, just after the "slight diligence" charge was made, the court instructed the jury that "the burden is on the plaintiff to show that *the healthcare provider* grossly failed to treat the patient *with ordinary skill, care, and diligence*," and added that "expert testimony must demonstrate a gross deviation from the recognized and *accepted standard of care*."[36] Based on this instruction alone, we are confident a jury of ordinary intelligence understood the Defendants to be "the healthcare provider" referenced in the

---

[35] *Scott v. Turner*, 375 Ga. App. 396, 401 (915 SE2d 704) (2025) (punctuation omitted); *accord Ash v. State*, 312 Ga. 771, 781 (2) (865 SE2d 150) (2021); *see Lofton v. State*, 309 Ga. 349, 366 (6) (b) (iv) (846 SE2d 57) (2020) (explaining that appellate courts presume that juries follow the trial courts' instructions).

[36] (Emphasis added).

instruction. Even so, only a few moments later, after instructing on the burden of proof, the court also explained:

> Applying this definition in the context of medical malpractice actions against Dr. Gadegbeku and Dr. Muhanna or against [NEGMC], would be authorized where the evidence including admissible expert testimony would permit a jury, defined by clear and convincing evidence, that the parties caused harm by grossly deviating from the applicable standard of care.

Given the combination of these instructions, the jury was certainly informed that the standard of care applied to the Defendants. The trial court did not err, then, in its charge to the jury in this regard.[37]

---

[37] *See Sagon v. Peachtree Cardiovascular & Thoracic Surgeons, P.A.*, 297 Ga. App. 379, 382-83 (677 SE2d 351) (2009) (holding the trial court did not err in giving a certain jury instruction when, "viewed in their entirety, the trial court's jury instructions gave a full and correct statement of the law regarding the standard of care that applied to all of the professional health care providers and were not confusing in defining the professional negligence issue"); *West v. Breast Care Specialists, LLC*, 290 Ga. App. 521, 522 (1) (659 SE2d 895) (2008) (holding a jury charge was proper when it "gave a full and correct statement of the law regarding the care and skill required of a physician and the proof required at trial to support a claim of medical malpractice").

4. Lastly, the Plaintiffs maintain the trial court erred by providing conflicting and confusing instructions on slight care and gross negligence. Once again, we disagree.

The trial court instructed the jury that the "plaintiff must prove by clear and convincing evidence that the gross negligence of the defendants, if any, was a proximate cause of the injuries to Barbara Smith." In the same charge, the court then instructed that "slight diligence or care is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances." And it added "[t]he absence of slight care is termed gross negligence." Later, the court charged the jury that it would be authorized to find the Defendants liable "where the evidence including admissible expert testimony would permit a jury, defined by clear and convincing evidence, that the parties caused harm by grossly deviating from the applicable standard of care."

The Plaintiffs now argue these instructions conflicted with each other and were confusing. More precisely, they assert the jury could not faithfully follow both instructions because in the first, it was told to determine on its own what the "slight care that inattentive persons of common sense" would use. Yet in the second, it was

directed to rely on expert testimony to determine whether the standard of care was breached. But this argument is merely a repackaging of the Plaintiffs' assertion that the definition of gross negligence in OCGA § 51-1-4 is inapplicable to define the legal concept of gross negligence in OCGA § 51-1-29.5 (c). We were not persuaded by that contention in Division 1 or in Division 2, *supra*, and we are likewise not persuaded by this new iteration of that argument here. The trial court's instructions reflected the holdings of our Supreme Court on this issue[38] and, therefore, were "adjusted to the evidence, apt, and a correct statement of the applicable law."[39] And their speculation aside, the Plaintiffs provide no evidence the jury found these charges confusing. As a result, these instructions did not constitute error.[40]

For all these reasons, we affirm the jury's verdict and the trial court's judgment.

*Judgment affirmed. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

[38] *See supra* note 31 & accompanying text.

[39] *Quinney*, 347 Ga. App. at 419 (2) (punctuation omitted).

[40] *See supra* note 33 & accompanying text.